## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ELIZABETH B. SANDZA,** | ) | |
| 4301 Forest Lane, N.W. | ) | |
| Washington, D.C. 20007 | ) | |
| **Plaintiff,** | ) | |
| vs. | ) | |
| **BARCLAYS BANK PLC,** | ) | |
| 745 7th Avenue | ) | |
| New York, NY 10019 | ) | |
| **IAIN WORSLEY,** | ) | **Civil Action** |
| 350 E 79th  St Unit 37A | ) | **No. _____** |
| New York, NY 10075 | ) | **Judge _____** |
| **SALLY MARTIN,** | ) | |
| Care of: Barclays Bank PLC | ) | |
| 745 7th Avenue | ) | |
| New York, NY 10019 | ) | |
| | ) | |
| **ANDREW JOHNMAN,** | ) | |
| 450 N End Ave Apt 11c | ) | |
| New York, NY 10282-1108 | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

Plaintiff, by undersigned counsel, complains of Defendants as follows:

## NATURE OF THE ACTION

Plaintiff is a former partner of Dewey LeBoeuf LLP ("D&L" or the "Firm") which was an

international law firm that was formed in October 2007 through the merger of LeBoeuf, Lamb,

Greene & MacRae, LLP ("LeBoeuf") and Dewey Ballantine LLP ("DB"). Plaintiff was the

victim of a fraudulent scheme perpetrated by the Firm which was made possible by Barclays' conduct. Barclays had insiders at the Firm who were instrumental in enabling the Firm's management ("Management") and its Executive Committee ("EC") (together, the "Control Group") to defraud the Plaintiff.

Starting in 2007 and continuing through 2012, Barclays insiders at the Firm formed an association-in-fact with Management and the EC which operated as a criminal enterprise under 18 U.S.C. § 1962(c) Racketeer Influenced and Corrupt Organizations Act. Based on information and belief, Barclays and the Control Group committed approximately 114 instances of mail and wire fraud during the period 2007-2012, and this constituted a pattern of "racketeering activity" as required by the RICO statute.

The Control Group committed three specific frauds, which the Barclays insiders were well aware of:

- First, it disseminated false and misleading financial statements and other financial information to non-management partners.
- Second, it failed to disclose to the non-management partners that the Firm was already in default with respect to numerous Barclays partner capital loans.
- Third, it failed to disclose to the non-management partners that the Firm itself was already in default with respect to its Barclays loan.

The Control Group committed wire fraud in order to induce the non-management partners to stay with the firm, leaving their capital in place and generating revenue and, with respect to some non-management partners, to make new or additional capital contributions to the financially troubled firm.

Barclays committed wire fraud by providing the means whereby these partners could make

1

capital and other financial contributions to the Firm based on the false information, i.e., by offering its capital loan program to the non-management partners to finance their capital contributions at a time when Barclays was armed with superior knowledge that the non-management partners were relying upon false and misleading financial statements and information to make critical financial decisions.   Barclays knew the partnership was receiving false and misleading financial statements and information because Barclays was privy to a significant amount of information about the Firm.

Barclays specifically knew that the Firm was not disclosing to the non-management partners that: (a) the Firm was already in default under several of its Barclays partner capital loans; and (b) by entering into the Barclays capital loans, the partners would themselves be automatically and immediately in default to Barclays, due to the cross-default provisions in Barclays loan documentation. To induce the non-management partners to stay with the Firm and make capital contributions, Barclays financed several new or increased partner capital loans. The non-management partners, in turn, contributed funds to the Firm in the form of new or increased capital and made other damaging personal decisions in reliance upon the false and misleading statements and information. These partners included the Plaintiff herein, and she seeks, *inter alia*, to secure an award of approximately $127,000 which she already paid to Barclays, $850,000 in deferred compensation lost, and other damages by way of this lawsuit.

By no later than late 2009, the Control Group knew that D&L could not survive for a number of reasons, including the fact that it had entered into contracts with new partners pursuant to which it guaranteed them multi-million dollar compensation which was not tied to their value to the Firm and grossly disproportionate to their value to the Firm on any commercially acceptable basis. The goals of the Control Group were: (a) enable D&L to survive as long as necessary; (b) to continue

its fraudulent scheme; (c) to repay credit facilities owed to Barclays; (d) stave off the Firm's eventual bankruptcy as long as possible to benefit themselves disproportionately to non-management partners; and (e) at all times keep the non-management partners in the dark as to the Firm's financial affairs.

Barclays knew of the inflated contracts, knew that D&L was in default under certain of its loans, knew that D&L could not survive, but yet conspired with the Control Group to finance substantial capital infusions into the Firm. These capital and other financial contributions made by non-management partners: (a) eliminated Barclays' exposure on the Firm's credit facilities; (b) kept the Firm in business; (c) prolonged the period in which the Control Group could enrich themselves at the expense of others, like the Plaintiff; and (d) made the Firm look financially viable, thereby causing partners like the Plaintiff to make damaging decisions, e.g., staying with the partnership and accepting promises of deferred compensation. Barclays intentionally and deliberately perpetuated the Firm's financial scheme by, *inter alia,* offering a partner capital loan program ("capital loan program") to partners that shifted the liability for the Firm's unsecured credit facilities owed to Barclays onto the participating partners.

The Plaintiff made a substantial capital contribution of $200,000 to the Firm, financed for the most part by Barclays' capital loan program, not knowing the true financial condition of the Firm, nor that the Firm itself had already defaulted on its own undertakings to Barclays.

On May 28, 2012 (the "Petition Date"), D&L filed a petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (*In re Dewey & LeBoeuf LLP* (Case No. 12-12321-MG) (the "D&L Bankruptcy").

There are six (6) additional non-RICO causes of action pled herein: (a) Count V: Fraud by Barclays; (b) Count VI: Criminal Conspiracy; (c) Count VII: Aiding and Abetting the Firm's

3

fraudulent conduct by Barclays; (d) Count VIII: Negligence by Barclays; (e) Count IX: Breach of Fiduciary Duty by Barclays; and (f) Count X: Declaratory Relief.

The paramount goal of the criminal conspiracy and fraudulent scheme was to keep non-management partners in the dark, which the association-in-fact was able to do courtesy of: (a) Barclays' involvement in the conspiracy and fraudulent scheme; (b) Barclays' endorsement of the auditor's conclusion that the Firm was achieving the "net profit" benchmarks required by its own credit facility documentation; and (c) Barclays' negligence including its abject lack of supervision of its insider employees at the firm.

At all relevant times herein, Barclays, its employees Defendants Iain Worsley ("Worsley"), Sally Martin ("Martin"), and Andrew Johnman ("Johnman") had superior knowledge of the Firm's financial situation, knowledge that was deliberately withheld from the Plaintiff. The Defendants all had numerous opportunities to educate the Plaintiff about what was going on at the Firm, but chose not to disclose the Firm's true financial condition and the fact that the Firm was already in a default status on its Barclays' debt obligations. Barclays had to know that the non-management partners, including Plaintiff, were acting on deceitful and erroneous information at all times herein regarding the Firm's finances and specifically when she executed her Barclays capital loan documentation.

## PLAINTIFF

1. Plaintiff is an individual residing 4301 Forest Lane, N.W., Washington, D.C. 20007. She is a lawyer specializing in insurance law. Plaintiff was a partner with LeBoeuf from January 1, 1989 to October 2007 when LeBoeuf merged with DB to form D&L. Plaintiff remained a partner with D&L until April 30, 2010. On or about 2009 and again in 2010, Plaintiff took out a Barclays partner capital loan of $38,000. Thereafter, on March 19, 2010, she took out an

additional Barclays partner capital loan for $125,000, totaling approximately $163,000, which, through payments, was later reduced to $127,000. Reserving her objections and right to sue Barclays, on January 31, 2014, Plaintiff Sandza paid off her $127,000 Barclays capital account loan balance plus interest of approximately $7,400 that Barclays charged her for the period of May 2012 through January 2014. Prior to her withdrawal from D&L, Plaintiff had been granted, and accepted, deferred compensation of $825,000, payable over a period of 11 years starting in 2011, to compensate for her having been underpaid in prior years.

## DEFENDANTS

2. Defendant Barclays is a public limited company registered in England and Wales with its principal place of business in London, England. Barclays conducts business throughout the United States including at 2100 K Street NW, Washington D.C.

3. Defendant Iain Worsley ("Worsley") was an employee of Barclays based in New York City, and a Relationship Director on the DB and subsequently D&L accounts.

4. Defendant Sally Martin ("Martin") was an employee of Barclays based in London whose major responsibility was to receive quarterly payments from the Firm and allocate those funds to the appropriate partner accounts.

5. Defendant Andrew Johnman ("Johnman") was an employee of Barclays based in New York City and a Relationship Director on the D&L account.

6. In settling claims with the D&L Bankruptcy Estate, the Plaintiff herein contributed substantial sums of money for the benefit of Firm creditors and assigned to the Estate her rights to sue Joel Sanders ("Sanders"), Stephen DiCarmine ("DiCarmine") and Steven Davis ("Davis"), all members of the Firm's Management. As a result they are not named herein.

## JURISDICTION

7. Jurisdiction of this Court is proper in this District premised on:

    (a) 28 U.S.C. § 1331 because the RICO claim arises under the laws of the United States,

    18 U.S.C. § 1964(c);

    (b) 18 U.S.C. § 1962(a) income earned on racketeering activities (RICO);

    (c) 18 U.S.C. § 1962(c) participation in a racketeering association-in-fact (RICO);

    (d) 18 U.S.C. § 1962(d) conspiracy to commit racketeering violations (RICO);

    (e) 28 U.S.C. § 1332 diversity subject matter jurisdiction; and

    (f) Pendent jurisdiction of the state law claims asserted herein.

## VENUE

8. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (2), and (3) because:

    (a) Plaintiff is domiciled in Washington, D.C. and the substantial injuries she has

    complained of herein all arose in this jurisdiction.

    (b) Barclays has availed itself of this jurisdiction by:

    (1) mailing documents to partners at law firms in Washington, D.C.;

    (2) suing and defending suits in Washington, D.C.; and

    (3) maintaining an office in Washington, D.C. Barclays is an international

    organization that will suffer no hardship if the litigation remains in Washington,

    D.C.

## ALLEGATIONS COMMON TO ALL CLAIMS

9. In the fall of 2005, DB management announced a new partner capital policy, to be effective

    for 2006.

10. Based on information and belief, the purpose of the capital policy was to bolster the Firm's

    financial position already burdened by a heavy debt load of $32,166,000, as shown in its

audited financial statements as of September 30, 2005.

11. The new capital policy included the option for a partner to participate in a "capital loan program" sponsored by Barclays.

12. Many DB partners executed Barclays loan documentation (Which consisted of a facility letter, an instruction letter, and an undertaking) in March 2006 to participate in the Barclays capital loan program.

13. The Barclays documentation required the Firm to repay each partner's Barclays capital loan upon such partner's departure from DB, whether by death, retirement or otherwise, using that partner's capital account which should have held the borrowed money.

14. Any excess of such partner's capital over the amount of the loan was to be returned to the partner pursuant to the terms of the partnership agreement.

15. Because Barclays was satisfied with the creditworthiness of DB, participation in the Barclays capital loan program was not conditioned on any standard of creditworthiness of the individual partners.

16. From late 2006 continuing into 2007, several DB partners withdrew from DB.

17. DB did not discharge its obligation to apply such partners' capital accounts to the repayment of their Barclays loans upon their withdrawal from the Firm.

18. The repeated failure by DB to repay the loans of such partners constituted, under the Barclays loan documentation, events of default with respect to the affected partners and, by virtue of cross-default provisions, with respect to all other participating partners.

19. Barclays and the Barclays insiders were aware of such events of default since it was Barclays own loans that were not being repaid. Barclays and the Barclays insiders were also aware that:

    (a)  such events of default, in respect of partners who withdrew on or prior to December 31, 2006, were not disclosed in DB's 2006 audited financial statements;

    (b)  such defaults, in respect of partners who withdrew after December 31, 2006, were not disclosed in DB's interim financial statements for periods ending after December 31, 2006; and

    (c)  by reason of such non-disclosure in DB's financial statements, existing and prospective non-management partners of DB were not aware of such events of default.

20. The September 30, 2006 audited financial statements indicated that DB's total long-term and short-term debt was $16,312,500.

21. The December 31, 2006 audited financial statements indicated DB's indebtedness was $15,750,000 (there having been a change in fiscal year requiring a new audit). Neither the aforementioned financial statements nor the notes thereto disclosed DB's defaulted obligations to repay the capital loans of departed partners.

22. During the summer of 2007 and into the fall, DB's management had merger discussions with LeBoeuf's management. In August 2007, according to D&L's audited financial statements as of December 31, 2007, Barclays extended an unsecured $5,000,000 term loan to D&L.

23. On October 1, 2007, DB and LeBoeuf merged to form D&L. The transaction was effected in three basic steps:

    (a)  the transfer of DB's assets to, and the assumption of DB's indebtedness, by LeBoeuf;

    (b)  the admission by LeBoeuf of the DB partners and new partners of LeBoeuf; and

    (c)  the change in the name of "LeBoeuf, Lamb, Greene & MacRae, LLP" to "Dewey & LeBoeuf LLP."

24. As indicated on D&L's audited financial statements as of December 31, 2007, the total long-term and short-term debt of D&L had increased to $144,554,596. Such financial statements and the notes thereto did not disclose D&L's defaulted obligations to repay any capital loans of departed partners.

25. In the spring of 2008, D&L management announced to the D&L partners that increased capital contributions were required. Such capital contributions could be made:

    (a) up front all in cash;

    (b) by withholding from draws and distributions in 2008 (so that it would all be paid in 2008, and not over a period of years); or

    (c) by participating in a new capital loan program sponsored by D&L and Barclays, which program the Plaintiff elected to participate in.

26. Because Barclays was satisfied with the creditworthiness of D&L, and just like the capital loan program made to DB in 2006, the new capital loan program made available to D&L in the spring of 2008 was not conditioned on the creditworthiness of any individual partner.

27. Barclays, at all relevant times herein, was a major commercial bank of international recognition, the sponsor of the 2006 capital loan program with DB, and the lender which extended the August 2007 credit facility to the Firm.

28. As a prime institutional lender to D&L, Barclays received periodic financial statements and other customary information from D&L and was keenly aware of D&L's growing indebtedness, since it knew firsthand that the Firm had already defaulted on its own capital loans.

29. The Barclays documentation for the 2008 capital loan program was substantially identical to that of the previous Barclays capital loan program except that the co-sponsor of the program,

and the co-obligor under the documentation, was D&L, not DB.

30.  The amount borrowed under the new program was the new amount of required capital as increased (and not just the amount of the increase). Thus, the 2008 capital loan program was a refunding and replacement of the borrowings under the 2006 program, in addition to providing funding for the additional amount of capital.

31.  As alleged herein, Barclays and its insiders were aware of the existing events of default under the Barclays capital loans and, by virtue of its own cross-default provisions in the capital loan documentation, under other credit facilities of D&L, since it was Barclays' own loans that had not been repaid.

32.  Barclays and the Barclays insiders were specifically aware that:

  (a)  as of December 31, 2007, the Firm's indebtedness to Barclays on the capital loan program stood at over $725,000;

  (b)  on June 20, 2007 Defendant Worsley and Peter Casey, the then Chief Financial Officer of DB, exchanged emails wherein they acknowledged that partners had departed and Worsley requested information on the former partners' capital accounts;

  (c)  as early as June 20, 2007 there were defaults on the capital loan program by reason of (i) there having been shortfalls in the capital accounts of certain partners (i.e., the amount of their respective capital loans exceeded the amount credited to their respective capital accounts) and (ii) the Firm had failed to apply the balance in such former partners' capital accounts to the repayment of their loans upon their withdrawal from the Firm.

  (d)  the extent of the Firm's indebtedness to Barclays under the capital loan program was

not disclosed in the Firm's audited financial statement as of December 31, 2007;

(e)  the defaults under the capital loan program, with respect to partners who withdrew on or prior to December 31, 2007, were also not disclosed in D&L's audited financial statements as of December 31, 2007; and

(f)  as a result of such non-disclosure, existing and prospective non-management partners were not aware of such indebtedness and events of default.

33. At the time Plaintiff executed her Barclays capital loan documents, Barclays and the Barclays insiders, while fully aware of the existing events of default including the Firm's delinquency on its own credit facility, failed to inform the Plaintiff:

(a)  of the existing events of default;

(b)  as of December 31, 2007, the Firm's indebtedness to Barclays under the capital loan program stood at over $725,000;

(c)  that the extent of the Firm's liability and defaults under the capital loan program were not disclosed on the Firm's audited financial statements for December 31, 2007 (the Firm's obligations thus being illusory and the former partners thus having become the sole obligors);

(d)  that Barclays had determined to take no action against the Firm to enforce its rights under the loan documents executed by the Firm (the Firm's obligations thus being illusory and the former partners thus having become the sole obligors); and

(e)  that by reason of the cross-default provisions, Plaintiff's own loan, like those of several other partners, would be in default status immediately upon the execution of the Barclays loan documentation.

34. During 2008, Barclays entered into a second separate and unsecured credit agreement with

11

D&L, a line of credit up to $30,000,000. By the end of that year, D&L had drawn down the full amount of that credit line, as shown on the audited financial statements as of December 31, 2008. As shown on the Firm's audited financial statement, D&L's total indebtedness as of December 31, 2008 was indicated to be $134,074,268.

35. The Firm's December 31, 2008 audited financial statements and the notes thereto did not disclose D&L's substantial obligations to Barclays to repay capital loans of departed partners to the extent of their capital accounts nor the fact that D&L itself was in default on such loans by virtue of the cross-default provisions contained in the Barclays capital loan documentation.

36. Meanwhile, during 2008, the Control Group held a number of video conference Firm meetings assuring the non-management partners that the firm was financially vibrant and released untrue revenue, profit and compensation figures to the American Lawyer for publication. Barclays at all relevant times knew that these revenue, profit, and compensation figures were misleading and designed to convince partners like the Plaintiff to remain with the Firm.

37. Some Partners withdrew from D&L during 2008 and 2009 and new partners joined D&L during those years. As in 2007 and 2008, the Firm failed to perform its obligations with respect to the capital loans of withdrawing partners. Thus, many new Firm partners participated in the Barclays capital loan program without being informed by Barclays or the Barclays insiders of the existing events of default or that, by reason of the cross-default provisions, their own loans were immediately in default status upon their execution of the Barclays loan documentation.

38. According to D&L's audited financial statements as of December 31, 2010, the $5 million

12

and $30 million Barclays unsecured credit facilities were repaid by the end of 2010. Based on information and belief, at least some of the funds contributed by the partners, including the Plaintiff, pursuant to the capital loan program were used to repay Barclays' unsecured credit facilities.

39. In the fourth quarter of 2008, Firm employees were asked by members of the Control Group to make false entries concerning the Firm's revenues and expenditures. The goal was to increase the Firm's net income level so that the Firm would be able to comply with covenants contained in Barclays and other lenders' loan documentation.

40. At December 31, 2009 and 2010, D&L's total indebtedness was $118,424,602 and $159,735,853, respectively, as shown on the audited financial statements as of such dates. Such financial statements and the notes thereto did not disclose D&L's substantial additional obligations to repay the capital loans of departed partners.

41. As in 2008, in 2009 and 2010, the Control Group held more video or teleconference Firm meetings assuring the non-management partners that the Firm was financially vibrant and released more untrue revenue, profit and compensation figures to the American Lawyer for publication to the non-management partners and the public.

42. D&L's audited financial statements as of December 31, 2010 and the notes thereto, disclose that by that date the Firm's unsecured $5,000,000 term loan and $30,000,000 line of credit (collectively, "$35,000,000 of unsecured credit facilities") extended by Barclays had been completely repaid.

43. In May 2010, Management approached partners, including L. Charles Landgraf ("Landgraf"), who had been a partner of LeBoeuf prior to the merger and induced them to participate in the Barclays capital loan program.

13

44. Management assured Landgraf that, *inter alia*, the obligation to repay the loan would be borne, at least primarily, by the Firm. This was the same understanding that the Plaintiff and other non-management partners shared.

45. Based on various misrepresentations representations, the partners who had been approached by management duly executed and delivered such documentation, without having been informed by Barclays or the Barclays insiders that:

    (a) the Firm was already in default under the Barclays capital loan program, and likely under other indebtedness;

    (b) Barclays had determined to take no action against the Firm to enforce its rights under the loan documents executed by the Firm (the Firm's obligations thus being illusory and the former partners thus having become the sole obligors); or

    (c) by reason of the cross-default provisions, their own loans were in a default status immediately upon execution of the Barclays loan documentation.

46. During 2010 several D&L partners, including the Plaintiff, withdrew from D&L and requested that the Firm return their capital contributions. But D&L management rejected their requests and suggested that Barclays might be willing to enter into a capital loan transaction with them. Subsequently, Management reported that Barclays would be willing to enter into such a transaction and caused such withdrawing partners, including the Plaintiff, to be provided the same documentation as used for all other capital loan transactions.

47. At all relevant times herein, Management assured the withdrawing partners, including Plaintiff, that the obligation to repay the loan would be borne by the Firm. The withdrawing partners, including Plaintiff, executed and delivered such documentation, without having been informed by Barclays or the Barclays insiders that:

14

(a)  the Firm was already in default under the Barclays capital loan program (and likely under other credit facilities);

(b)  Barclays had determined to take no action against the Firm to enforce its rights under the loan documents executed by the Firm (the Firm's obligations thus being illusory and the former partners thus having become the sole obligors); or

(c)  such loans would be in default status immediately upon the execution of Barclays capital loan documentation.

48. From 2007 to 2010, By virtue of its sponsorship of the capital loan program and it being a lender under two other D&L credit facilities, Barclays was entitled to and did receive financial information regarding the Firm, which it knew was false and misleading.

49. Representatives of Barclays, including the Barclays insiders, discussed the dissemination of financial information and other matters with representatives of Management. Such discussions included the repayment of the departed partners' loans so that the Firm would cure that default, at a minimum.

50. At all relevant times herein, Barclays and the Barclays insiders were fully aware that the Firm had failed to perform its obligations in respect of the repayment of such loans. Yet Barclays and the Barclays insiders took no action to enforce such repayment. Nor did Barclays or the Barclays insiders ever make known to Barclays' customers, the nominal borrowers on the capital loans including Plaintiff, that commencing in 2007, the Firm had a long track record of failing to perform its obligations to make such repayment, even as the financial condition of the Firm, as shown on the face of the financial statements furnished to Barclays, continued to deteriorate.

51. Such acquiescence and non-disclosure by Barclays continued until all of the Firm's

indebtedness to Barclays was in the form of capital loans under which individual partners were the nominal obligors instead of the Firm.

52. The shifting of liability for the credit facilities under which the Firm, rather than the individual partners, was the obligor, onto individual partners was consistent with Barclays' plan to reduce or eliminate any exposure it had arising out of its dealings with the Firm.

53. Barclays, the Barclays insiders and Management all knew that, had Barclays taken action to enforce payment of the defaulted capital loans, all partners would have eventually become aware of the deteriorating financial condition of the Firm, likely precipitating an exodus of partners from the Firm.

54. Such partner withdrawals would have:

    (a)  increased the Firm's obligation to repay capital loans;

    (b)  made it impossible to attract new partners; and

    (c)  made it increasingly unlikely that Barclays' other credit facilities would ever get paid off; Barclays, its insiders, and Management intentionally chose to keep any and all issues concerning partner withdrawals confidential, and did not share that information with the Plaintiff. Barclays was hoping that its loan exposure would be reduced and knew that disclosure of these issues would lead to mass exodus of partners from the Firm, ensuring the Firm's collapse.

55. As indicated by D&L's audited financial statement and accompanying notes, Barclays made sure that its exit strategy was successfully implemented to secure the repayment of the Firm's outstanding credit facilities with Barclays totaling $35,000,000 of unsecured debt, which left Barclays with no exposure arising out of its dealings with the Firm.

16

## COUNT I: PARTICIPATION IN RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) VIOLATION UNDER 18 U.S.C. § 1962(c) BY DEFENDANTS WORSLEY, MARTIN, AND JOHNMAN

56.   Plaintiff hereby repeats and realleges Paragraphs one through 55 of this Complaint as if fully recited herein.

57.   Plaintiff files suit pursuant to Section 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, which confers a private right of action on any person injured in his or her business or property by reason of a violation of § 1962 of RICO.

58.   The RICO violation is the conduct of an enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), namely the use of mailings and wire transmissions in furtherance of a scheme to use and defraud or obtain property by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. §§ 1341 and 1343.

59.   The RICO enterprise was an association-in-fact of Barclays insiders at the Firm, i.e., Defendants Worsley, Martin, Johnman, all of whom worked with the Control Group, through which D&L was enabled to continue to engage in interstate commerce by providing legal services to clients throughout the U.S. and abroad for a period of time.

60.   This association-in-fact was a corrupt organization that, for at least three years, defrauded the Plaintiff and other non-management partners through a distinct fraudulent scheme. Barclays participated in and knowingly financed the scheme.

61.   Starting in 2006, the departed partners' capital loan balances were not paid by D&L to Barclays. The Firm's failure to pay the balances constituted separate acts of

default, which were not criminal in nature.

62. The predicate criminal activity required by RICO started when the first partner or lateral partner obligated himself to the Firm and the bank without being told of the Firm's existing default, based on its own undertaking with Barclays, or the Firm's dire financial condition. As each subsequent partner or lateral partner so obligated himself to the Firm and the Bank, new criminal acts occurred by reason of

(a) The failure to disclose the existing defaults to the new participant in the capital loan program and

(b) The failure to disclose to the then participating partners that a new default had occurred on their loans by reason of the loan to the new participant being immediately in default. As any partner who participated in the loan program subsequently withdrew from the Firm, new criminal acts occurred by reason of the failure to disclose to the remaining participating partners that

(i) yet another default on their loans had occurred by virtue of the Firm's failure to repay such partner's capital loan and

(ii) Barclays had effectively unilaterally modified the capital loan program, without the consent of any participating partners, by determining to take no action against the Firm in respect of such default and to thenceforth look only to the partner for repayment and not the Firm.

Every similar instance thereafter engaged in by the Firm and the association-in-fact was a transaction making up a three-year pattern of racketeering activity up through 2011. Every member of the association-in-fact engaged in the aforementioned racketeering activity.

18

63.   The Barclays insiders engaged in a pattern of racketeering activity, *inter alia*, by continuing to offer the capital loan program by which Barclays extended loans to each of the participating partners and by keeping non-management partners in the dark as to the Firm's defaults or its deteriorating financial condition.

64.   The victims of the racketeering activity engaged in by Barclays insiders were the Plaintiff and other non-management partners who were fraudulently induced by the Control Group

    (a) to enter into the capital loan program and invest capital into the Firm based on false and misleading financial statements, and

    (b) to blindly continue generating revenue for D&L without any knowledge of the Firm's defaults or its deteriorating financial condition, and

    (c) to agree to accept promises of deferred payment of compensation in lieu of suing the firm.

65.   The Control Group knew that, for many years, Barclays had not required D&L to pay off the delinquent capital loans of partners who had left the Firm, a violation of Barclays' loan documents.

66.   The Control Group knew, for many years, that the partners who had left D&L had no idea that their capital account loans had not been paid off, in breach of the undertaking D&L had executed as a condition of each loan. Some partners were even told by the Firm that payments had been made on their capital accounts.

67.   Barclays knowingly and deliberately allowed D&L to breach the undertaking because it knew that, if it called for repayment of capital account loans of departed partners, the entire Firm would collapse by reason of cross-defaults to other indebtedness,

other lenders thereupon accelerating indebtedness, and increasing partner departures, among other things, thereby causing Barclays to lose millions of dollars owed by the Firm under its credit facilities with D&L, which were unsecured, meaning that when bankruptcy filing occurred, Barclays would be treated as a general creditor.

68.  Over a period of at least three years, certain Control Group members knowingly and deliberately sent through the U.S. mails, by facsimile transmission and by wire misleading and duplicitous financial statements and other inaccurate financial information pertaining to the Firm's operations.

69.  Barclays had contemporaneously received these duplicitous financial statements as a lender to the Firm and knew, at a minimum, that they did not disclose material facts pertaining to the Firm's obligations and the Firm's repeated defaults under the capital loan program. Even though Barclays possessed this superior knowledge vis-à-vis that of the non-management partners, it made no effort to educate the non-management partners, including the Plaintiff named herein, about these material and significant omissions.

70.  Management even failed to acknowledge that there were capital loans of departing partners starting in 2006 that had not been paid off and that D&L was in material breach of the Undertaking relating to the capital loans of each of the departed partners. The mailing, faxing, and wire transmittal of these financial statements on the part of Management constituted a knowing violation of 18 U.S.C. § 1343, which Barclays was aware of at all relevant times herein.

71.  The Barclays insiders knew that the fraudulent financial statements that D&L had prepared would be presented to, and relied upon by the D&L non-management

partners like the named Plaintiff herein.

72. The acts taken by the Barclays insiders in furtherance of the criminal enterprise described above:

(a) instilled confidence in the Plaintiff and other participating partners that D&L and Barclays were pursuing an agenda that would ensure the Firm's long-term success,

(b) reinforced the Plaintiff's understanding that the capital loans of the departing partners had been paid off when they had left D&L, and

(c) reinforced the Plaintiff's belief that D&L was a financially viable and stable organization in which they could invest with confidence.

73. Had Barclays disclosed the truth about the Firm's operations and the details of its relationship with the Firm, the Plaintiff could have made better decisions or at least taken steps to mitigate her damages. She would have initially discussed the Firm's financial plan with the remaining partners at D&L so that she, as well, could take steps to protect herself. In particular, she could have taken steps to assure that the Firm would perform its obligations to repay her capital loans if she ever left the Firm. Moreover, the Plaintiff would not have agreed to deferred compensation arrangements to be paid over future periods.

74. Had the Plaintiff known of the Firm's multiple defaults or its true financial condition, or the irregular accounting practices the Firm had engaged in, the Plaintiff would not have enrolled in the Barclays capital loan program, and would have withdrawn from the Firm unless adequate measures were taken to reform management and its practices.

21

75.     By virtue of Barclays insiders' participation in the fraudulent scheme of the Control Group in violation of 18 U.S.C. §1962(c), the Plaintiff herein has been damaged in the sum of at least $1,000,000.

WHEREFORE, the Plaintiff hereby requests an:

(a) entry of judgment against the individual Defendants named herein for $1,000,000 and have that amount trebled;

(b) award for reasonable attorneys' fees;

(c) award of costs incurred by the Plaintiff in bringing suit; and

(d) award of prejudgment and post judgment interest.

### COUNT II: RESPONDEAT SUPERIOR UNDER RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) AGAINST BARCLAYS

76.     Plaintiff hereby repeats and realleges Paragraphs one through 75 of this Complaint as if fully recited herein.

77.     Based on the doctrine of *Respondeat Superior*, Barclays is vicariously liable for any and all damages caused by its insiders' conduct as alleged herein because:

(a) its insiders identified herein were acting at all relevant times as Barclays agents and within the scope of their authority and

(b) Barclays had repeatedly ratified the individuals' misconduct.

78.     It is appropriate for the application of the Respondeat Superior doctrine because Barclays was the direct beneficiary of the insiders' conduct having secured the retirement of all credit facilities that Barclays had extended to the Firm and by receiving substantial interest payments arising therefrom and from the capital loan program.

22

79.    For such injuries proximately resulting from the misconduct of the Barclays insiders as described herein, Barclays is vicariously liable to the Plaintiff for any and all damages that she has sustained as a result of said misconduct.

WHEREFORE, the Plaintiff hereby requests an:

    (a) entry of judgment against Barclays for at least $1,000,000 and have that amount trebled;

    (b) award for reasonable attorneys' fees;

    (c) award of costs incurred by the Plaintiff in bringing suit; and

    (d) award of prejudgment and post judgment interest.

## COUNT III: DERIVING INCOME FROM RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) VIOLATION UNDER 18 USC § 1962(a) BY DEFENDANT BARCLAYS

80.    Plaintiff hereby repeats and realleges Paragraphs one through 79 of this Complaint as if fully recited herein.

81.    At all relevant times herein, the Firm was an enterprise engaged in interstate commerce by providing legal services to clients throughout the U.S. and abroad.

82.    The Control Group participated in a pattern of racketeering activity in which non-management and lateral partners were enticed into joining or staying with the Firm when it was already in weak financial condition and were persuaded to inject capital and other revenue into the Firm under the belief that the Firm was a viable and stable business entity.

83.    Barclays earned income on this racketeering activity in the form of:

    (a)  interest on the loans;

23

      (b)  interest on the two outstanding credit facilities totaling $35,000,000; and

      (c)  the repayment of such outstanding credit facilities

84.  When the Firm filed for bankruptcy protection Barclays suffered no loss because all the Firm's obligations to Barclays had been repaid. Barclays did not file a claim in the Firm's bankruptcy arising out of its capital loan programs – deciding to pursue only the individual participating partners for repayment instead.

85.  Starting in 2006, Barclays allowed the Firm to retain the proceeds of capital loans beyond the date by which the Firm was obligated to repay the same to Barclays, and to invest these funds in the Firm, in order to keep the Firm afloat for the various reasons already referenced in the Complaint.

86.  The Firm, with Barclays' knowledge and acquiescence, allowed its partners' capital accounts to become impaired since the Firm's net income and cash flow were not otherwise sufficient to meet the Firm's increasingly burdensome financial obligations.

87.  Barclays assisted the Firm in recruiting new participants by keeping the capital loan program available in order to bolster the Firm's liquidity and to perpetuate the view that the Firm was a viable entity, thereby increasing its prospects of collecting payment of borrowings under the $35,000,000 of unsecured credit facilities.

88.  But for Barclays' decision to invest the capital loan funds in the Firm, the Firm likely would have failed much earlier, perhaps in 2008 or 2009. If Barclays had permitted such a failure, borrowings under the $5,000,000 term loan and $30,000,000 line of credit would have been uncollectible.

89.  Because the Firm was able to operate and fraudulently portray itself as a viable and

24

stable business during the four and a half years from 2007 to mid-2012, due in large part to Barclays' encouraging statements, the Plaintiff was deceived into believing that the Firm was on solid financial footing.

90.   Barclays' willingness to extend credit to the partners without performing any due diligence perpetuated a false impression that the Firm was in good financial condition

91.   As hereinbefore noted, upon her withdrawal, the Plaintiff herein agreed to accept deferred compensation in the amount of $825,000, payable in future years, in order to compensate her for the Firm's under-payment in prior years.

92.   Plaintiff herein would never have agreed to such deferred compensation if she had known the true financial condition of the Firm. Rather, Plaintiff would have taken action to protect herself including, together with other non-management partners, changing the management of the Firm or at least restricting its negligent, imprudent and fraudulent business and financial practices. All such deferred compensation was lost as a result of the Firm's bankruptcy.

93.   Plaintiff would have known the true financial condition of the Firm had Barclays disclosed to her the material facts in their possession, and had Barclays, for its own benefit, not delayed the Firm's collapse by allowing the investment of capital loan funds into the Firm until the Firm had repaid the $35,000,000 owed to Barclays under the credit facilities.

WHEREFORE, the Plaintiff hereby requests an:

  (e) entry of judgment against Barclays for at least $1,000,000 and have that amount trebled;

  (f) award for reasonable attorneys' fees;

25

(g) award of costs incurred by the Plaintiff in bringing suit; and

(h) award of prejudgment and post judgment interest.

## COUNT IV: CONSPIRACY TO COMMIT RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) VIOLATIONS UNDER 18 USC § 1962(d) BY DEFENDANT BARCLAYS

94.   Plaintiff hereby repeats and realleges Paragraphs one through 93 of this Complaint as if fully recited herein.

95.   As alleged in Count I, Barclays insiders and Management committed RICO violations, under 18 U.S.C. 1962(c) by participating in and condoning racketeering activity barred by that section.

96.   As alleged in Count III, Barclays insiders and Management committed RICO violations, under 18 U.S.C. 1962(a) by gaining income for Barclays and the Firm based on their racketeering activity.

97.   Barclays and Management conspired to commit the RICO violations described in Counts I and III in violation of 18 U.S.C. 1962(d).

98.   By 2007, Barclays knew that the Firm was not able to meet its obligations under the capital loan program.

99.   In late 2007 and early 2008, management developed a scheme, with the knowledge of Barclays, to increase existing partners' capital contributions and to attract a substantial influx of new partners to inject capital into the Firm and keep the Firm viable.

100.  Management, with Barclays' knowledge, implemented its scheme by providing partners and prospective partners with erroneous and misleading financial statements and by disseminating financial information in partner meetings and to the American

Lawyer that misrepresented the Firm's true financial condition.

101.   By late 2009, Barclays learned that the Firm would likely be unable to meet its

obligations under the Barclays unsecured $5,000,000 term loan and $30,000,000 line

of credit, and its insiders conspired with management to:

(a) take no action (i.e., a notice of default letter required under its bank

documentation) against the Firm in respect of the Firm's defaults under the

capital loan program;

(b) intentionally conceal such defaults; and

(c) continue making capital loans available to non-management partners to provide

liquidity to the Firm and the means with which Barclays' credit facilities could be

paid off. Barclays knew, given the Firm's precarious financial situation, that it

would be forced to look to the individual partners for repayment of their

individual loans when the Firm filed for bankruptcy, which Barclays knew was a

realistic possibility. Because of the facilities' unsecured status, Barclays would

merely be one of many general creditors with claims against the Firm's

bankruptcy estate.

102.   Relying on such material and misleading information, and not being advised of the

existing Firm defaults under the capital loan program, or the existence of irregular

accounting practices and other adverse financial information known to Barclays,

Plaintiff enrolled in the Barclays capital loan program to her financial detriment.

103.   Plaintiff was injured in the amount of $995,496 ($825,000 in lost deferred

compensation, $127,000 in capital loan repayments, $7,400 in interest on that loan,

and $36,096 in bankruptcy estate contributions and attorney fees) and sustained other

pecuniary losses as a result of Barclays' conduct.

WHEREFORE, the Plaintiff hereby requests an:

    (a) entry of judgment against Barclays for at least $1,000,000 and to have that amount trebled;

    (b) award for reasonable attorneys' fees;

    (c) award of costs incurred by the Plaintiff in bringing suit; and

    (d) award of prejudgment and post judgment interest.

### COUNT V: FRAUD BY BARCLAYS

104. Plaintiff repeats and realleges one through 103 as though fully recited herein.

105. As detailed, *infra*, Barclays engaged in a lengthy and continuous pattern of fraudulent behavior, whereby non-management partners were deprived of their interests in the Firm and suffered serious monetary losses arising out of the Firm's bankruptcy filing and other legal proceedings.

106. This pattern of fraudulent conduct included the following specific acts:

    (a) starting in 2006, Barclays made a decision to disregard the Firm's defaults under its loan documentation by failing to discharge its obligations to the bank in terms of paying off departed partners' capital accounts and to conceal this decision from non-management partners, when making loans to them and thereafter from time to time when new defaults occurred.

    (b) Barclays continued with this deception for at least four years up through and including 2010;

    (c) knowing that the Firm was in default and that non-management partners were not

aware of the defaults, Barclays continued to deceive non-management partners by concealing its knowledge of the defaults and the Firm's financial condition and accounting irregularities;

(d)   although the financial statements from 2006-2010 did not disclose the existence of defaults on the Firm's part with respect to departing partners' capital loans and knowing that the non-management partners were not aware of the defaults, Barclays made no effort to disclose these defaults to the non-management partners, when making loans to them and thereafter from time to time when new defaults occurred.

(e)   knowing that the Firm needed substantial capital infusions to survive, Barclays continued to offer a capital loan program with new borrowers, including the Plaintiff, not knowing that they were investing in a failed enterprise;

(f)   Barclays further defrauded these partners by not disclosing material information to them after they were encouraged and solicited by the Firm to enroll in the capital loan program and as a result accept responsibility to repay the then existing significant financial obligations owed by the Firm;

(g)   since proceeds of the capital loans were, at least to some extent, used to repay the Firm's indebtedness to Barclays under the $35,000,000 of credit facilities extended to the Firm and since Barclays had already determined not to enforce the Firm's obligations to Barclays under the capital loan program, the partners were unknowingly in effect being substituted as the sole obligors on the Firm's indebtedness to Barclays.

107.   In addition to engaging in the above instances of fraudulent behavior, Barclays aided and

29

abetted the fraudulent scheme perpetrated by the Firm. The fraudulent scheme consisted of the following:

(a) keeping non-management partners in the dark about the Firm's defaults;

(b) keeping non-management partners in the dark about the Firm's dire financial condition;

(c) making sure the Firm's default status was not disclosed on the Firm's financial statements; and

(d) disseminating the false message that the Firm was in good financial condition and had a long-term future.

108. As part of its fraudulent conduct, Barclays concealed from the non-management partners fundamental and material information concerning the Firm's true financial condition and its long-term viability. Barclays specifically concealed during the time period 2006 to 2011:

(a) that the Firm itself was in default with respect to its own credit facilities with Barclays;

(b) the Firm's precarious ongoing financial condition;

(c) the bank's insider knowledge concerning the Firm's deteriorating financial condition;

(d) the Firm's desperate need for short-term credit facility arrangements in order for it to survive;

(e) the Firm's inability to achieve financial performance benchmarks as provided for in Barclays' loan documentation; and

(f) its intention to shift significant Firm obligations to the partners themselves by

virtue of the capital loan program.

109. The Plaintiff herein was substantially damaged by the pattern of fraudulent conduct engaged in by Barclays. She was damaged in the amount of not less than $1,000,000 by taking out capital loans, by deferring compensation, and by having to pay a portion of the Firm's liabilities which arose out of the bankruptcy filing and other legal proceedings.

110. Based on Barclays' fraudulent conduct as described above, the Firm's fraudulent scheme succeeded, causing the non-management partners to lose their interests in the Firm and sustain substantial damages.

WHEREFORE, the Plaintiff hereby requests an:

(a) entry of judgment against Barclays for at least $1,000,000;

(b) award of costs incurred by the Plaintiff in bringing suit; and

(c) award of prejudgment and post judgment interest.

## COUNT VI: CRIMINAL CONSPIRACY ENGAGED IN BY BARCLAYS AND THE FIRM

111. Plaintiff hereby repeats and realleges Paragraphs one through 110 of this Complaint as if fully recited herein.

112. Defendant Barclays and Management embarked upon a criminal conspiracy starting no later than 2008. The goals of the criminal conspiracy were:

(a) to keep the Firm in business with the appearance of profitability and financial success indefinitely;

(b) to ensure that Barclays unsecured $5,000,000 term loan and $30,000,000 line of credit were paid off;

(c) to arrange a $150,000,000 bond-offering and a $100,000,000 secured bank financing for the benefit of other commercial lenders; and

> (d) to keep the non-management partners in the dark regarding the true financial condition of the Firm so those partners would not withdraw from the partnership, causing significant income loss and triggering the Firm's obligation to repay additional amounts of Barclays capital loans.

113. Barclays knew that the Firm was in dire financial condition. Barclays clearly understood that new capital had to be injected into the Firm so it would not collapse.

114. Barclays also knew that the $35,000,000 of unsecured credit facilities it had extended to the Firm would not be repaid based on projected Firm revenues, so it intentionally overlooked and concealed the Firm's multiple defaults arising from its capital loan program. Barclays simultaneously continued to finance the participation of unsuspecting partners in its capital loan program to facilitate the Firm's repayment of its substantial Barclays debt.

115. The proceeds generated by the Barclays capital loan program financing arrangement went into the Firm's general funds and were then used, at least in part, to repay Barclays' $35,000,000 of unsecured debt.

116. To make sure that the non-management partners would not learn of the true financial condition of the Firm, the conspirators herein:

> (a) made sure that the financial statements did not disclose the full extent of the Firm's liabilities, knowing that the non-management partners, like the Plaintiff herein, would not question these financial statements;
>
> (b) made sure that Barclays would not declare the Firm in default for failure to pay well over $1,000,000 in capital accounts of departed partners;
>
> (c) condoned and/or caused the Firm to continue to broadcast the message, which

32

Barclays knew was inaccurate, that the Firm was financially stable and a

viable entity for the near future. Barclays knew that the above-referenced

message was inaccurate, but made no effort to share that information with the

non-management partners;

(d) condoned and/or caused the Firm to encourage laterals to come into the Firm

and make substantial capital contributions; and

(e) similarly encouraged existing and newly named partners to finance their

capital contributions through Barclays.

117.   Largely as a result of partners and new laterals injecting millions of dollars of capital

into the Firm, courtesy of the Barclays capital loan program, the Firm was able to pay

off Barclays in full.

118.   At all relevant times herein, the non-management partners were kept in the dark and

only knew of the Firm's financial condition and prior default status with Barclays

when the bankruptcy filing occurred. While the partners all signed the required

documents for the Barclays capital loan program, they had no inkling that the Firm

owed Barclays a substantial amount of monies regarding departed partners' capital

loan delinquencies going all the way back to 2006. Nor did the partners know when

they signed their Barclays capital loan documents the dire financial condition of the

Firm. At all relevant times, the Barclays insiders possessed superior knowledge,

including the fact that the management committee was falsifying the Firm's business

records.

119.   As a specific result of this criminal conspiracy, the Plaintiff has sustained

substantial damages, the total amount of which are not able to be calculated at this

time, but likely exceed $3,000,000.

WHEREFORE, the Plaintiff hereby requests an:

(a) entry of judgment against Barclays for at least $1,000,000;

(b) award of costs incurred by the Plaintiff in bringing suit; and

(c) award of prejudgment and post judgment interest.

## COUNT VII: AIDING AND ABETTING THE FIRM'S FRAUDULENT SCHEME BY DEFENDANT BARCLAYS

120. Plaintiff hereby repeats and realleges Paragraphs one through 119 of this Complaint as if fully recited herein.

121. As already described in this Complaint, various individuals and entities played a role in bringing down the Firm and some individuals even engaged in criminal conduct.

122. All of the Defendants shared a common goal which was to keep the non-management partners and new laterals in the dark concerning the Firm's financial condition. While at the same time Barclays continued to assist the partners by offering to finance their capital contributions.

123. Defendant Barclays aided and abetted the Firm's fraudulent scheme by:

(a) funding the Firm through the Barclays capital loan program;

(b) not disclosing to the unsuspecting non-management partners who had enrolled in the capital loan program that the Firm had already incurred multiple defaults under the Barclays capital loan program;

(c) not disclosing to participants in the capital loan program that the Firm's financial statements were false and misleading at least to the extent of the non-disclosure of defaults under the capital loan program;

34

(d) acquiescing in Management's efforts to falsify business records; and

(e) acquiescing in the Firm's repeated and material defaults and determining not to exercise its rights under the capital loan program and not disclosing that decision to the capital loan program participants.

124. Plaintiff was injured by these nondisclosures and was damaged by an amount not less than one million dollars by taking out partner capital loans, by agreeing to defer compensation, and by having to pay a portion of the Firm's liabilities in bankruptcy and otherwise.

125. But for Barclays' willing participation in aiding and abetting the Firm's fraudulent scheme it would have never succeeded.

126. The scheme succeeded and the non-management partners were injured as a result.

WHEREFORE, the Plaintiff hereby requests an:

(a) entry of judgment against Barclays for $1,000,000;

(b) award of costs incurred by the Plaintiff in bringing suit; and

(c) award of prejudgment and post judgment interest.

**COUNT VIII: NEGLIGENCE COMMITTED BY DEFENDANT BARCLAYS**

127. Plaintiff hereby repeats and realleges Paragraphs one through 126 of this Complaint as if fully recited herein.

128. At all relevant times herein, Barclays knew: (a) the true financial condition of the Firm and (b) that non-management partners were not privy to the true financial condition of the Firm.

129. Barclays also knew that non-management partners relied heavily on the managing partners to run the Firm and specifically to manage its financial affairs in a

35

professional manner.

130.  At all relevant times herein, Barclays' close-working relationship with the Firm
      resulted in Barclays:

    (a)  having superior knowledge to that of the non-management partners
        concerning relevant aspects of the Firm's operations;

    (b)  knowing that the non-management partners did not have superior knowledge;

    (c)  knowing that the non-management partners could not acquire such knowledge
        on their own by examining the Firm's financial statements; and

    (d)  knowing that had the non-management partners acquired such knowledge they
        would have never enrolled in the capital loan program.

131.  Even though the non-management partners did not have the knowledge that Barclays
      possessed, each of them fully expected, and was entitled to expect, that Barclays
      would notify him or her of any events of default of the Firm under the capital loan
      program that directly or indirectly put his or her own capital loan into default.

132.  As early as 2006, six years before the Firm's bankruptcy filing, Barclays knew of a
      major default, i.e., that the Firm had not paid Barclays capital loan balances for the
      numerous partners who had departed from the Firm.

133.  In 2008 and 2009, Barclays further learned that the Firm was in deep financial
      trouble and was actually considering the issuance of a $150,000,000 bond-offering to
      cover various shortfalls.

134.  Barclays also eventually learned that the Firm was incapable of surviving, unless it
      received a large infusion of cash.

135.  As the Firm's financial condition continued to deteriorate, Barclays made no attempt

to educate non-management partners as to the true financial state of the Firm.

136. Although Barclays owed various duties to the non-management partners, it continued its pattern of not disclosing material facts to non-management partners pertaining to the Firm's deteriorating financial condition, including the aforementioned illicit accounting practices or events of default.

137. Instead, Barclays kept making new capital loans to unsuspecting D&L partners, increasing its interest income from D&L.

138. As a result of Barclays' failure to disclose material facts to the non-management partners, Barclays precluded the non-management partners from taking various actions to remedy the situation. The non-management partners could have terminated the Firm's management team and implemented a new management team to devise a successful restructuring.

139. Based on this continuous failure to disclose material facts re the Firm's true financial condition, Barclays breached the duty it owed to the non-management partners to exercise reasonable care, and not do anything to impair the non-management partners' financial interests in the Firm.

140. Barclays failed to take reasonable measures which could have been implemented in 2009 to:

(a) notify the Firm including non-management partners about the remedy it had, i.e., terminate the relationship unless certain conditions have been met;

(b) send the clear message that unless extravagant spending was curtailed the bank would terminate the relationship; and

(c) send the clear message that unless the practice of excessive compensation

packages ceased that the bank would terminate the relationship.

    (d) make full disclosure to non-management partners of all material facts known to it relating to the Firm's financial condition.

141. During its relationship with the Firm, Barclays exhibited a clear indifference to the non-management partners' interests except when it came to securing their signatures on the loan documentation for the capital loan program. Barclays' strategy was to shift the Firm's unsecured debt onto the shoulders of unsuspecting non-management partners, and that strategy proved quite successful.

142. Barclays conducted the capital loan program, but failed to disclose existing defaults or that, starting in 2009, Barclays' agenda was to reduce and/or eliminate its own exposure by securing new capital contributions which could be used to repay the Firm's indebtedness to Barclays.

143. During its longstanding relationship with the Firm and all the way through the period preceding the bankruptcy filing, Barclays:

    (a) failed to exercise reasonable care consistent with its contractual obligation under English law to not impair the non-management partners' interests in the Firm;

    (b) failed to discharge its duty to the non-management partners who had enrolled in the capital loan program to disclose the Firm's true financial condition before enrolling; and

    (c) failed to disclose its inherent conflict of interest, knowing that funds derived from the capital loan program would be used to repay the Firm's outstanding obligations to Barclays, in direct conflict with its contractual obligations under

English law.

144.   Barclays' pattern of non-disclosure of vital information pertaining to the Firm and its
       indifference to the interests of the non-management partners included the following:

   (a)   failed to effectively monitor the activities of its insiders at the Firm who had
         been approached by members of the Control Group requesting help to keep
         the Firm going;

   (b)   failed to declare the Firm in default in 2006, 2007, 2008, 2009, 2010, and
         2011 re departed partners' capital loan balances;

   (c)   failed to effectively monitor the activities of their insiders, including their
         interaction with Firm Management;

   (d)   failed to scrutinize the Firm's finances or its business plan going forward;

   (e)   failed to call on the client and put the Firm on notice of potential termination
         of the relationship, unless certain results were achieved and full disclosure
         was made to the non-management partners;

   (f)   agreed with the Firm to start and/or continue its capital loan program, despite
         its conflict of interests;

   (g)   failed to inform non-management partners of the Firm's default in connection
         with departed partners' capital loan balances upon signing and from time to
         time thereafter;

   (h)   failed to require a meeting with the EC and a non-management partner
         representative to discuss the Firm's various unusual activities, including the
         prospect of a bond offering and the potential impairment of the bank's
         collateral resulting from a dramatic decline in collections;

(i)   failed to verify the Firm's alleged compliance with established benchmarks of performance required by covenants contained in Barclays and other lenders' loan documentation;

(j)   failed to surface concerns about the Firm going forward and the irregular accounting practices it had engaged in;

(k)   failed to disclose its conflict of interests to non-management partners;

(l)   used or caused the Firm to use its proceeds derived from the capital loan program to pay down the credit facilities which significantly reduced Barclays' exposure to the Firm; and

(m)  failed to effectively monitor the activities of its insider employees (Defendants Worsley and Martin), and specifically to determine if vital financial information was being withheld from the non-management partners.

145.   Instead of using the proceeds derived from the capital loan program to eliminate or reduce Barclays' exposure, the Firm should have used the proceeds to reach standstill agreements with the Firm's major creditors. In doing so, the Firm would have alleviated the severe financial pressure it was working under and enhanced the Firm's ability to survive.

146.   As a result of Barclays' negligent conduct the Plaintiff herein has lost her interest in the Firm, has been obliged to pay off debt obligations arising out of the bank's fraudulent conduct and has sustained other financial damages.

WHEREFORE, the Plaintiff hereby requests an:

(i)   entry of judgment against Barclays for $1,000,000;

(j)   award of costs incurred by the Plaintiff in bringing suit; and

40

(k) award of prejudgment and post judgment interest.

## COUNT IX: BREACH OF FIDUCIARY DUTY BY DEFENDANT BARCLAYS

147.  Plaintiff hereby repeats and realleges Paragraphs one through 146 of this Complaint as if fully recited herein.

148.  Barclays is a sophisticated international bank, and in particular, is specialized in law firm lending, is knowledgeable about such issues as law firm economics, law firm merger issues and law firm challenges during the recent economic crisis, among other issues.

149.  Barclays had an extensive financial relationship with the Firm. In addition to sponsoring the capital loan program for several years, Barclays extended an unsecured $5,000,000 term loan and a $30,000,000 line of credit.

150.  Moreover, Barclays had insiders at the Firm who knew or should have known how bad things were. Barclays failed to:

(a)  exercise customary scrutiny of a major business entity that was its debtor;

(b)  address the fact that since the debtor's financial condition had severely deteriorated and the bank's collateral had thus been impaired, the Firm should adopt expense control mechanisms and restrictions on revenue distributions; and

(c)  exercise effective oversight and supervision consistent with the standards of the banking industry.

151.  When Barclays undertook the responsibilities associated with providing financial services to the Firm, it knew how the Firm operated and its management structure.

152.  Consistent with its obligation to "know thy customer," Barclays also knew that the

Firm had a substantial number of non-management partners during the relevant years from 2006 to 2012 who were not privy to the inner workings of the Firm like Barclays was.

153. Barclays had extensive experience with large Firms and knew how dedicated Firm partners were in discharging duties to the Firm's various clients.

154. Such dedication required the partners to log long hours on a daily basis, with little time available to participate in the Firm's management.

155. Barclays knew or had reason to know that partners who were considering signing up or enrolling in the capital loan program would consult its website, which contained various promotional materials. Barclays stressed its recognition of the partner's unpredictable work schedules and further assured partners that they would take care of any financial issues associated with the capital loan program.

156. Based on Barclays' various relationships with New York-based law firms, Barclays knew that the non-managing partners for the most part left day-to-day operations to the managing partners.

157. Barclays also knew that non-management partners for the most part would not scrutinize quarterly and/or annual financial statements.

158. Barclays' contract with the Plaintiff stated that U.K. law applied. As such, Barclays was subject to the U.K. Banking Code, the U.K. Business Banking Code, and the U.K. Financial Services Authority's PRIN Principles for Business. Pertinent sections include:

   (a) Banking Code, para 2, requiring Barclays to operate with "fairness" and to "lend responsibly";

(b) Banking Code, para 13.1, requiring Barclays to assess whether the Plaintiff would

be able to repay the loan prior to making the loan offer;

(c) Banking Code, para 13.4, requiring Barclays to encourage the Plaintiff to take

independent legal advice before entering into a loan as a surety;

(d) PRIN para 2.1(9), stating that Barclays maintains a relationship of trust with

clients, including the Plaintiff.

159.   As recited in the Allegations Common to All Claims, the Plaintiff herein enrolled in

Barclays' partner capital loan program knowing that it owed the Plaintiff a fiduciary

duty to disclose any and all aspects of the Firm's financial affairs, particularly those

about which it was uniquely aware.

160.   At all relevant times concerning these transactions, Barclays owed Plaintiff a

fiduciary duty to disclose to her any and all aspects of the Firm's financial affairs,

particularly those about which it was uniquely aware, including the existence of

multiple defaults and illicit accounting procedures and practices.

161.   Barclays at all relevant times had superior knowledge vis-à-vis the Plaintiff of any

and all aspects of the net capital loan program, especially its decision to forego

pursuing events of default and the accrual of the Firm's resultant indebtedness to the

bank.

162.   Plaintiff had no opportunity to acquire similar knowledge of the inner-workings of

the Firm, since she was a non-management partner and because the financial

statements and information disseminated to her were false and misleading.

163.   Moreover, Plaintiff had been specifically instructed by Firm Management that she

would not have access to the Firm's books and records.

43

164.   At all relevant times concerning the above described transactions, Barclays knew that the Plaintiff did not have certain material information which would have affected their respective decisions to basically invest in the new Firm. For example, the Plaintiff had no idea that at the time she executed her Barclays loan documentation, the Firm itself was in default on its own undertakings to Barclays.

165.   The Firm was in default because it had failed to pay approximately $1,000,000 in loan account balances to Barclays who had departed the Firm back to 2006. The Plaintiff also did not know that as other partners left the Firm, Barclays did not demand the Firm to pay those capital account loans either.

166.   Until such time that she had the opportunity to examine financial statements at the close of the year, the Plaintiff was also unaware that Barclays had extended the Firm an unsecured $5,000,000 term loan and a $30,000,000 line of credit or that Barclays was worried about having the Firm's debts repaid before it filed for bankruptcy protection.

167.   Had Plaintiff known any of these material facts described above, she would have initially investigated the matter and would have not executed the Barclays capital loan documentation. In addition, the Plaintiff would have probably left the Firm after she learned of the Firm's dire financial condition and the fact the Firm had experienced multiple defaults.

168.   As a result of Barclays' failure to disclose material facts in this special kind of relationship, Barclays breached its fiduciary duty to the non-management partners like the Plaintiff. Barclays knew because of its extensive experience in the law firm industry that if other partners learned the true financial condition of the Firm and/or

44

the fact that the Firm was already in default, that there would have been a mass exodus of partners and the Firm would have collapsed. If the Firm had financially collapsed, this would have prevented the Firm from repaying Barclays $35,000,000 of unsecured credit facilities that it had extended to the Firm.

169.   Plaintiff signed her Barclays loan documentation package not knowing the material facts pled herein regarding the Firm's financial condition, facts which were known to Barclays for a number of years.

170.   As a result of Barclays' failure to disclose the material facts described above, the Plaintiff duly executed her Barclays loan documentation and was required to pay significant debt obligations to Barclays, for no less than the sum of $127,000. WHEREFORE, the Plaintiff hereby requests an:

   (a) entry of judgment against Barclays for $1,000,000

   (b) award of costs incurred by the Plaintiff in bringing suit; and

   (c) award of prejudgment and post judgment interest.

### COUNT X: DECLARATORY RELIEF

171.   The Plaintiff hereby repeats and realleges paragraphs 170 as if fully recited herein.

172.   The Plaintiff was advised by the Firm of the availability of the Barclays capital loan program to fund her required capital contributions to the Firm.

173.   The Plaintiff was furnished with the Barclays documentation and enrolled in the program.

174.   Because the Firm was in debt to numerous lenders and could not refinance various lines of credit, it needed to examine alternative funding sources, for example, capital contributions by its own partners, knowing that Barclays would finance the capital

45

contributions made by the members of the Firm.

175.    At the time of these transactions, Barclays:

    (a)  had superior knowledge about the true financial condition of the Firm and specifically as to the existing defaults under the capital loan program;

    (b)  knew that the non-management partners did not have such knowledge;

    (c)  had repeatedly waived the Firm's default status re the capital loan balances owed to Barclays for departed partners;

    (d)  had no intention of collecting payments from the Firm to cover the capital loans being taken out by the partners, making the stated obligations of the Firm in the loan documentation illusory and deceptive; and

    (e)  knew that if the partners learned about (a) through (e), they never would have executed the loan documents prepared by Barclays to satisfy their alleged obligations to the Firm.

176.    Not being privy to the foregoing, the Plaintiff herein executed her Barclays loan documents and unknowingly obligated herself, as a sole obligor, to Barclays.

177.    Thereafter, the Firm's indebtedness to Barclays was repaid at least in part with the Plaintiff's capital contributions made to the Firm.

178.    But for the funds injected into the Firm via the capital loan program, the Firm would have financially collapsed earlier and Barclays' debt would not have been repaid.

179.    Based on the above facts, the Plaintiff seeks a declaratory judgment that all prior obligations owed to Barclays arising out of the capital loan program are deemed to be unenforceable, thus warranting the return of all monies paid by Plaintiff to Barclays for these loans, as well as an interest award calculated from the time of payment.

(a) said obligations were based on documents specifically created by Barclays to justify the partners' indebtedness to Barclays and serve as a basis to collect on the notes executed by the partners;

(b) Barclays' purpose was to shift Firm indebtedness onto the individual partners which it succeeded in doing via the capital loan program; and

(c) these funds were not capital contributions to the Firm but in actuality loans made to the Firm for no consideration.

WHEREFORE, the Plaintiff hereby requests an:

(a) entry of an Order rescinding the Barclays capital loan documents that the Plaintiff executed and declaring all obligations arising out of the capital loan program as unenforceable as a matter of law;

(b) entry of judgment against Barclays for $1,000,000;

(c) award of costs incurred by the Plaintiff in bringing suit; and

(d) award of prejudgment and post judgment interest.

## **RELIEF REQUESTED**

The Plaintiff seeks various relief as described in this Complaint. Given the nature of Barclays' conduct, however, especially its indifference to the non-management partners and its repeated long-term failure to disclose material information to the non-management partners, the Plaintiff respectfully asks this Court, assuming she is successful on any of the Counts contained herein, to hold a hearing to determine whether an award of punitive damages is appropriate and whether it is appropriate to submit that issue to the jury to consider and decide.

47

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands trial by jury as to all issues so triable.

By:   */s/ Martin F. McMahon*

Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Transnational Business Attorneys Group
Martin F. McMahon & Associates
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 - 4343
mm@martinmcmahonlaw.com
*Counsel for Plaintiff*