## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
**ELIZABETH B. SANDZA,**                              )
                                                     )
    **Plaintiff,**                                   )
                                                     )
        **v.**                                   )    **Civil Action No. 15-732 (ESH)**
                                                     )
**BARCLAYS BANK PLC,** *et al.*,                      )
                                                     )
    **Defendants.**                                  )
———————————————————— )

## <u>MEMORANDUM OPINION</u>

Plaintiff, a former partner at the now-defunct law firm Dewey & LeBoeuf LLP ("D&L" or "the Firm"), brings this suit against Barclays Bank PLC ("Barclays") and three of its employees (the "individual defendants").  She alleges that defendants conspired with the Firm's management to fraudulently induce her and other non-management partners to take out capital loans with Barclays, the proceeds of which were used to prop up the failing Firm and effectively securitize the Firm's own loans with Barclays.  (*See* Compl. [ECF No. 1] at 1-4.)  Central to the alleged scheme was a concerted effort to "keep the non-management partners in the dark as to the Firm's financial affairs," which encouraged partners to take out the capital loans and forestalled a mass exodus from the Firm.  (*See id.* at 2-3.)  As a result, she alleges that she was injured when the Firm filed for bankruptcy in May 2012, as she was unable to recover her capital contributions and other deferred compensation, which she would not have agreed to defer had she known of the Firm's condition.  (*See id.* at 2.)

She asserts one claim against the individual defendants for participation in a RICO violation under 18 U.S.C. § 1962(c).  (*Id.* ¶¶ 56-75.)  She also asserts nine claims against

Barclays: (1) *respondeat superior* under RICO (*id.* ¶¶ 76-79); (2) deriving income from a RICO violation under 18 U.S.C. § 1962(a) (*id.* ¶¶ 80-93); (3) conspiracy to commit a RICO violation under 18 U.S.C. § 1962(d) (*id.* ¶¶ 94-103); (4) fraud (*id.* ¶¶ 104-10); (5) criminal conspiracy (*id.* ¶¶ 111-19); (6) aiding and abetting (*id.* ¶¶ 120-26); (7) negligence (*id.* ¶¶ 127-46); (8) breach of fiduciary duty (*id.* ¶¶ 147-70); and (9) declaratory relief that plaintiff's loan agreement with Barclays is unenforceable (*id.* ¶¶ 171-79).

Defendants have moved to dismiss on a variety of grounds.  (*See* Defs.' Mot. to Dismiss [ECF No. 7]; Def. Martin's Mot. to Dismiss [ECF No. 9] (joining co-defendants' motion to dismiss).)  The Court need not address many of those arguments,[1] because for several alternative reasons, plaintiff's complaint cannot survive.

## BACKGROUND

Plaintiff Elizabeth Sandza was a partner at LeBoeuf, Lamb, Greene & MacRae, LLP ("LeBoeuf") from 1989 until 2007, when that firm merged with Dewey Ballantine LLP ("DB") to form D&L.  (Compl. ¶ 1.)  Throughout Ms. Sandza's tenure as a D&L partner, the Firm carried a significant amount of debt, dating back to LeBoeuf's merger with DB.  (*See id.* ¶¶ 24, 40.)  Plaintiff alleges that, in 2005, DB began requiring increased capital contributions from its partners as a result of its debt burden, which grew from approximately $32 million in 2005 to $145 million soon after the 2007 merger, and by 2010, D&L owed approximately $160 million. (*Id.* ¶¶ 9-10, 24, 40.)  DB (and post-merger D&L) facilitated these capital contributions by

---

[1] The Court need not consider whether: plaintiff's RICO claims are barred by the Private Securities Litigation Reform Act (Defs.' Mot. to Dismiss at 13-17) and are also time-barred (*id.* at 17-19); plaintiff's aiding and abetting claim fails as a matter of law (*id.* at 37-39); plaintiff's criminal conspiracy claim fails as a matter of law (*id.* at 42-43); plaintiff's declaratory judgment claim is not cognizable as a separate cause of action (*id.* at 43); and plaintiff has failed to serve defendant Martin, and in any event, the Court lacks personal jurisdiction over her (*see generally* Def. Martin's Mot. to Dismiss).

directing partners to Barclays, which had established a capital loan program that gave partners

access to the necessary funds.  (*Id.* ¶¶ 11, 25.)

Plaintiff took out two loans with Barclays: a $38,000 partner capital loan in 2009 and a

second loan for $125,000 in March 2010, a month before she left the firm.  (*Id.* ¶ 1.)  The

proceeds of plaintiff's capital loan were deposited with the Firm in her capital account, and she

alleges that, upon her departure in April 2010, the Firm was obligated to repay the loan from her

capital account and transfer the remaining balance to her.  (*See id.* ¶¶ 1, 13-14.)  However, when

she sought the return of her capital account balance, the Firm refused to release those funds,

instead suggesting she take out the second, $125,000 loan with Barclays.  (*See id.* ¶ 46.)  Having

been assured by the Firm that it would repay the loan, she executed the agreement.  (*Id.* ¶ 47.)[2]

She also agreed with the Firm to accept deferred compensation of $850,000, payable over 11

years starting in 2011, to make up for amounts she had been underpaid in previous years.  (*Id.* ¶

1.)

Separately, Barclays was also a creditor of D&L, having extended it an unsecured $5

million loan in August 2007 and an unsecured $30 million credit facility in 2008.  (*Id.* ¶¶ 22, 34.)

It is these loans that plaintiff alleges gave Barclays the motive to conspire with the Firm, for,

having extended $35 million in unsecured loans to a failing Firm, Barclays sought to protect

itself by inducing the partners to take out capital loans, which would be used by the Firm to pay

---

[2] There is some ambiguity in the complaint regarding how this loan was used, either as another capital contribution to the Firm (from which she was leaving imminently) or for plaintiff's own benefit, *i.e.*, an advance on the disbursement that the Firm refused to make upon her departure. *Compare* Compl. at 3, ¶ 1 ($125,000 was a "partner capital loan," and plaintiff's $200,000 total capital contribution was "financed for the most part by Barclays' capital loan program") *with id.* ¶ 46 (alleging that the Firm suggested she take out a capital loan in lieu of her receiving disbursement of her capital account).  This issue is not especially relevant to the instant motion, but it is worth noting that if she personally received the benefit of the $125,000 loan, then it would be difficult to see how repayment of that loan injured her.

off its own loans with Barclays.  (*See* Compl. at 2-3.)  In other words, according to plaintiff's theory, the unsuspecting partners would be left holding the bag for the Firm, remaining personally liable for their capital loans while the Firm's own loans were fully repaid as of December 2010.  (*See id.* at 2-3, ¶ 42.)

The alleged scheme depended upon keeping non-management partners in the dark about the Firm's troubles, thus inducing partners to make additional capital contributions and preventing a mass exodus from the partnership ranks, which in turn allowed the Firm to remain viable for a longer period.  (*See id.* at 3.)  Plaintiff alleges that defendants (1) excused the Firm's defaults under departed partners' loan agreements and failed to inform partners about those defaults, and (2) failed to disclose to plaintiff and other partners the Firm's poor financial condition.  (*See id.* at 2-3.)  As to the defaults, she alleges that the Firm failed to repay departing partners' capital loans, and when the Firm's growing indebtedness under those loans reached a certain amount, a default was triggered affecting every partner loan agreement.  (*See id.* ¶¶ 13, 17-18.)  She does not allege that the defaults themselves caused her any injury, but rather that their disclosure by Barclays would have alerted her to the Firm's dire financial straits, allowing her to make "better decisions or at least take[] steps to mitigate her damages."  (*See id*. ¶ 73.)

Plaintiff also alleges that Barclays and Firm management committed "approximately 114 instances of mail and wire fraud," with Firm management "disseminating false and misleading financial statements . . . to non-management partners," and Barclays "providing the means whereby these partners could make capital . . . contributions to the Firm."  (*See id.* at 1-2.)  She makes very few specific allegations as to the individual defendants, claiming only that they each worked for Barclays on the D&L account (*id.* ¶¶ 3-5); that they had "superior knowledge of the Firm's financial situation" (*id.* at 4); and that they formed an association-in-fact that "engaged in

a pattern of racketeering activity, *inter alia*, by continuing to offer the capital loan program" without disclosing the Firm's dire financial condition (*id.* ¶¶ 59, 63).

In the end, the Firm filed for bankruptcy in May 2012, and plaintiff alleges that it was not until that time that she learned of the Firm's defaults and its underlying financial problems.  (*Id.* at 3, ¶ 118.)  The Firm's bankruptcy prevented her from recovering any of her deferred compensation, and in January 2014, she agreed to repay Barclays her outstanding loan balance of approximately $134,000, while reserving the right to bring suit against Barclays.  (*Id.* ¶¶ 1, 92.)

## ANALYSIS

## I.   LEGAL STANDARD: RULE 12(b)(6)

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" such that a court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  Thus, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted).  In ruling on a 12(b)(6) motion, a court may consider facts alleged in the complaint, documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim.  *U.S. ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 24-25 (D.D.C. 2010).

## II.    IMPLAUSIBILITY

At the outset, defendants argue for dismissal on the ground that Ms. Sandza's overarching theory of liability strains credulity.  (*See* Defs.' Mot to Dismiss at 7-9; *see also Iqbal*, 556 U.S. at 678.)  The gravamen of her complaint is that Barclays conspired with Firm management to induce her and other non-management partners to take out capital loans, the proceeds of which would "eliminate[] Barclays' exposure on the Firm's credit facilities."  (*See* Compl. at 3.)  At first glance, this theory has some intuitive appeal—Barclays overextended itself to a troubled Firm and then, upon learning of its dangerous exposure, figured out a way to use non-management partners to effectively securitize the Firm's loans.  The problem for plaintiff is that her own allegations seriously undercut this theory.

First, the lynchpin of the alleged scheme, Barclays' capital loan program, was put into place nearly two years before Barclays faced any exposure on its first loan for $5 million to the Firm.  (*See id.* ¶¶ 9, 11, 22.)  Next, plaintiff alleges that Barclays learned of the Firm's difficulties in 2007, when it received financial information from the Firm that it "knew was false and misleading."  (*See id.* ¶ 48; *see also id.* ¶ 99 ("In late 2007 and early 2008, management developed a scheme, with the knowledge of Barclays . . . to inject capital into the Firm and keep the Firm viable.").)  According to plaintiff, rather than cutting off all ties upon learning of the misrepresentation and underlying financial woes, however, Barclays extended the Firm a second *unsecured* $30 million line of credit in 2008.  (*Id.* ¶ 34.)  Even if Barclays only learned of the Firm's troubles in late 2007, after it extended the August loan, Barclays would still have had to

extend an unsecured $30 million line of credit *with full knowledge that the Firm was both in financial trouble and lying about it.*[3]

That improbability does not mean, however, that dismissal is warranted.  *See Iqbal*, 556 U.S. at 681 ("To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. . . . It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").  The plausibility standard looks to the factual sufficiency of the complaint, rather than the probability that plaintiff can ultimately prove those facts.  *See Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.") (internal quotations omitted).  Therefore, it is immaterial if defendants are correct that "[n]o bank, concerned enough about a $5 million exposure that it would hatch a byzantine plot to eliminate it, would in the midst of that plot increase its credit exposure seven-fold."  (Defs.' Mot. to Dismiss at 8.)

## III.  FAILURE TO STATE A CLAIM – ALL COUNTS

At bottom, all of Ms. Sandza's claims and legal theories rest on two central allegations: (1) defendants failed to disclose that, at the time she took out her capital loans, the Firm had already defaulted on its obligations to repay capital loans of previously departed partners, which

---

[3] Defendants have also attached to their motion to dismiss two emails between Barclays and the Firm, suggesting that Barclays offered *another* $20 million line of credit to the Firm in April 2010, but it was rebuffed in part because Barclays was "more demanding than [the Firm's] other banks in respect of financial information."  (*See* Ex. 3 to Defs.' Mot. to Dismiss [ECF No. 7-4] at 11-15.)  As plaintiff alleges, both of the Firm's outstanding loans were repaid in 2010 (Compl. ¶ 38), which from Barclays' perspective was the very object of the alleged conspiracy (*see id.* at 3).  It is highly implausible that Barclays would increase its exposure by $20 million at the same time its alleged conspiracy was about to succeed.  That said, the Court will not consider these emails on a motion to dismiss, and it declines defendants' invitation to convert the motion into one for summary judgment.  (*See* Defs.' Mot. to Dismiss at 9 n.7.)

caused her own loans to immediately go into default (*see* Compl. at 1-4); and (2) defendants failed to disclose that the Firm was facing dire financial difficulties.  (*See id.* at 4 ("The Defendants all had numerous opportunities to educate the Plaintiff about what was going on at the Firm, but chose not to disclose the Firm's true financial condition and the fact that the Firm was already in a default status on its Barclays' debt obligations.").)[4]  Even these allegations overlap, in that the "defaults" themselves had no financial consequences for plaintiff, but disclosing their existence would have revealed to her the Firm's financial troubles.  (*See* Pl.'s Opp'n at 4 ("Plaintiff's injury does not stem from whether the Firm was in default on a certain date . . . [but rather] is a direct result of Barclays' failure to disclose material facts [about the Firm's finances] . . . .").)  Had defendants made these disclosures to Sandza, she alleges that she "would not have enrolled in the Barclays capital loan program, and would have withdrawn from the Firm unless adequate measures were taken to reform management and its practices."  (*Id.* ¶ 74.)

Because there were no unremedied defaults for Barclays to disclose, and because Sandza fails to allege a cognizable duty requiring defendants to disclose the Firm's financial condition (even assuming they had notice of this condition), all of her claims fail as a matter of law.

---

[4] Plaintiff's opposition also weakly asserts that defendants "actively disseminated misrepresentations," citing to Paragraph 107 of her complaint.  (Pl.'s Opp'n at 21.)  However, Paragraph 107 merely alleges a fraudulent scheme "*perpetrated by the Firm* . . . [that involved] disseminating the false message that the Firm was in good financial condition," which Barclays allegedly aided and abetted.  (*See* Compl. ¶ 107 (emphasis added).)  Even if the Court were to infer that Barclays aided the scheme by *also* making fraudulent misrepresentations, such a bare, conclusory allegation would not satisfy *Iqbal*, let alone the heightened specificity requirement of Rule 9(b).  *See* 556 U.S. at 681; Fed. R. Civ. P. 9(b).  Therefore, the Court finds no support in the complaint for a reasonable inference that defendants made affirmative misrepresentations.

### A. Unremedied Defaults

Plaintiff alleges that, "under Barclays loan documentation," the Firm was obligated to apply the balance of departing partners' capital accounts towards the outstanding amount of their Barclays loans. (Compl. ¶¶ 17-18.) When several partners departed and the Firm took no action, the Firm's resulting indebtedness triggered a default, and, due to a cross-default provision in the loan agreements, the loans of all participating partners also went into default. (*Id.* ¶¶ 16-18.) Nonetheless, according to plaintiff, Barclays allegedly chose not to enforce its right to immediate repayment after those defaults—and not to inform plaintiff or other partners about them—because doing so would have revealed the Firm's deterioration, thereby "precipitating an exodus of partners . . . [and] ensuring the Firm's collapse." (*See id.* ¶¶ 53-54.) However, plaintiff's allegations of unremedied defaults rest entirely upon a misreading of the operative loan agreements.[5]

Ms. Sandza's loan agreement consists of three sections: (1) a facility letter setting forth the terms of her agreement with Barclays; (2) Schedule A, an Instruction Letter in which plaintiff requested from the Firm a Partnership Undertaking in connection with her loan; and (3) Schedule B, the Partnership Undertaking executed by the Firm. (*See* Ex. 2 to Defs.' Mot. to Dismiss (the "Loan Agreement").) The relevant "default" provision appears in Paragraph 10.1(j) of the

---

[5] Plaintiff did not attach the loan agreement to her complaint, but she relied on it repeatedly in support of her "default" allegations. (*See, e.g.*, Compl. ¶¶ 13, 17-18, 21.) As such, the Court will consider the copy that defendants attached to their motion to dismiss. *See Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) ("[W]here a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment."). Moreover, the parties agree that plaintiff's capital loan agreement is materially identical to those of other Firm partners. (*See* Decl. of Andrew Johnman [ECF No. 7-10] ¶ 3; Pl.'s Opp'n at 4 (English court decisions involving different Firm partners interpreted "the very same contract drawn up by Barclays").)

facility letter, which states that plaintiff's loan will go into default "in the event of any indebtedness of the Firm in excess of US$250,000 becoming immediately due and payable . . . by reason of default on the part of any person." (*Id.* ¶ 10.1(j).) Next, Paragraph ii(b) of the Partnership Undertaking provides that the Firm "will apply the balance of the [departing] Partner's Capital Account in satisfying (so far as is possible) any indebtedness remaining outstanding under the Loan with the Bank, before paying any residue to the Partner or to the Partner's legal personal representatives." (*Id.* at Schedule B ¶ ii.) Therefore, plaintiff's argument goes, the Firm's failure to apply departing partners' capital accounts toward their outstanding loans created a shortfall in excess of $250,000, thus sending Sandza's own loan into default. (*See* Compl. ¶¶ 13, 17-18.)

The loan agreement provides that it "shall be governed by and construed in accordance with the laws of England." (Loan Agreement ¶ 11.1.) Such a choice-of-law provision is given effect under D.C. law as long as there is a "reasonable relationship" with the chosen jurisdiction, which is satisfied when one of the parties has its principal place of business in that jurisdiction. *See Ladd v. Chemonics Int'l, Inc.*, 603 F. Supp. 2d 99, 115 n.11 (D.D.C. 2009). Because Barclays' principal place of business is London, England (Compl. ¶ 2), the Court will construe the loan agreement according to English law.

In determining how the relevant "default" provisions would be interpreted under English law, the Court can rely on "any relevant material or source." Fed. R. Civ. P. 44.1. It must predict what English courts would find, unless those courts have already addressed the issue. See *Anglo Am. Ins. Grp., P.L.C. v. CalFed, Inc.*, 899 F. Supp. 1070, 1077 (S.D.N.Y. 1995). Here, there is no need to predict how English law would be applied, because the Court already has the benefit of an English court's interpretation of this exact provision. *See Barclays Bank*

10

*PLC v. L. Londell McMillan*, [2015] EWHC 1596 (Comm).  In *McMillan*, Barclays sued a former Firm partner for repayment of his capital loan, and the partner defended on the grounds that he had relied upon Barclays' false, implied representation that no unremedied defaults existed at the time he took out the loan.  *See id.* ¶¶ 17(6), 21.  The English court found no merit to this defense, holding that the Firm's only obligation under Paragraph ii(b) of the Partnership Undertaking is "negative in form," requiring the Firm to refrain from paying the capital account balance to the departing partner in preference to Barclays.  *See id.* ¶ 71(6) (allegation of unremedied defaults "fails as a matter of fact and law").  In other words, "[i]f there is no payment to the partner there is no breach of obligation to [Barclays]." *Id.*

Just so here.  Plaintiff does not allege that the Firm paid any former partners in preference to Barclays.  On the contrary, she alleges that the Firm refused numerous requests for capital account disbursements, including plaintiffs' own.  (*See* Compl. ¶ 46.)  Therefore, because there were no unremedied defaults under English law, there could not possibly have been any failure by Barclays to disclose them.  Thus, any claims relating to "undisclosed defaults" necessarily fail as a matter of law.

Plaintiff's attempts to respond to this conclusion are unpersuasive.  First, she attempts to distinguish *McMillan* because it involved a different procedural posture, *i.e.*, a contractual defense to the enforcement of a loan agreement, rather than a tort action in which only one count "even remotely touches upon the question of contract interpretation."  (*See* Pl.'s Opp'n at 3-4.)  In making this argument, plaintiff ignores the fact that issues of contract interpretation permeate her entire cause of action, and that, regardless of the procedural posture, the English court considered and rejected the very same "unremedied default" argument she advances here.  *See McMillan*, [2015] EWHC 1596 (Comm) ¶ 71(6).  Next, she contends that, even if this Court

were to accept *McMillan*'s holding, it must still allow expert discovery regarding English law, because a different English court found that the same Barclays contract might support a claim that the capital loan was a sham transaction.  (Pl.'s Opp'n at 4 (citing *Barclays Bank PLC v. Landgraf*, [2014] EWHC 503 (Comm)).)  This is a *non sequitur*.  Even if another English court had found that a loan between Barclays and a Firm partner was a sham from the outset, it would not follow that the terms of the loan agreement required *the Firm* to satisfy that partner's debt, which is an entirely unrelated issue.  Thus, there is no reason to allow discovery, for the parties have only identified one English decision addressing the alleged defaults, and it forcefully rejected the very argument that plaintiff makes here.

These "defaults" form the foundation of plaintiff's case, and without them, her other allegations quickly crumble.  For instance, her claim seeking a declaration that the loan agreements are unenforceable cannot be sustained, because it rests solely on the fact that she made the agreements without knowledge of the defaults.  (*See* Compl. ¶¶ 171-79.)

Similarly, her allegations that defendants committed (or conspired with the Firm to commit) mail and wire fraud must also be rejected.  She identifies two types of alleged wire fraud: (1) the Firm's dissemination of misleading financial statements, "which the [individual defendants] were well aware of," and (2) Barclays' continued offering of capital loans "with superior knowledge that the non-management partners were relying upon false and misleading financial statements."  (*See* Compl. at 1-2.)  In other words, liability arising from either type of alleged wire fraud depends upon defendants' knowledge that the Firm had put out false financial statements.  *See First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10, 33 (D.D.C. 1998) (RICO defendant's ignorance of illegal activity is an absolute bar to liability unless that ignorance is willful or reckless).  But the only specific allegation that defendants knew of false financial

statements rests entirely on the non-existent defaults.  (*See, e.g.*, *id.* at 2 ("Barclays specifically knew that the Firm was not disclosing to the non-management partners that: (a) the Firm was already in default under several of its Barclays partner capital loans; and (b) by entering into the Barclays capital loans, the partners would themselves be automatically and immediately in default to Barclays . . . ."); *id.* ¶ 19(a) (Barclays knew that "such events of default . . . were not disclosed in DB's 2006 audited financial statements"); *id.* ¶ 24 ("[S]uch financial statements . . . did not disclose D&L's defaulted obligations to repay any capital loans of departed partners.").) Plaintiff does not specifically allege that Barclays knew about any other discrepancies in the financial statements, and the Court will not credit her unsupported speculation to the contrary. (*See id.* ¶ 69 (Barclays "knew, *at a minimum*, that [the financial statements] did not disclose material facts pertaining to . . . the Firm's repeated defaults") (emphasis added).)

Factual support for plaintiff's conspiracy claims also erodes once the defaults are disregarded, as Barclays' alleged agreement to secretly excuse the defaults formed the initial basis for the conspiracy.  (*See id.* ¶ 101.)  Plaintiff alleges that the conspiracy was formed soon after Barclays learned of the Firm's financial trouble, in order to keep the Firm in business and ensure that Barclays was repaid its $35 million in loans.  (*See id.* ¶¶ 99-101 (RICO conspiracy); *id.* ¶ 112 (common law conspiracy).)  However, again, the only specific allegation that Barclays had advance knowledge of the Firm's struggles is that it knew about the non-existent defaults. (*See id.* ¶ 98; *see also id.* ¶ 175(a) (Barclays made capital loans with "superior knowledge about the true financial condition of the Firm and *specifically as to the existing defaults under the capital loan program*") (emphasis added).)

At one point, plaintiff vaguely alludes to Barclays' awareness of insufficient "projected Firm revenues" (*id.* ¶ 114), but she does not provide any detail about those projections that might

make the allegation plausible. *See Iqbal*, 556 U.S. at 681. After all, her complaint is riddled

with allegations that the Firm publicly released false financial records (*e.g.*, Compl. at 1-2, ¶ 36),

and that an auditor concluded that the Firm *was* successfully hitting its net profit benchmarks

under its Barclays loan agreements (*id.* at 4). Without more factual elaboration, it is difficult to

reconcile these allegations with the notion that Barclays, the Firm's $35 million creditor, had

information about the true revenue projections. The same problem undermines her allegation

that Barclays knew of "inflated contracts" given to incoming Firm partners, which allegedly

should have alerted Barclays of the Firm's imminent failure. (*See id.* at 2-3.) Given that her

complaint repeatedly alleges that the Firm falsified its financial records (s*ee, e.g.*, *id.* at 1-2, ¶

36), she offers insufficient facts to show how or why Barclays would have learned that these

contracts were, in fact, inflated. In short, without the defaults that allegedly tipped Barclays off,

Sandza's complaint lacks any explanation as to how Barclays went from an unknowing lender to

an active participant in the Firm's fraud. *See Twombly*, 550 U.S. at 557 ("[W]ithout that further

circumstance pointing toward a meeting of the minds, an account of a defendant's commercial

efforts stays in neutral territory."). As such, her conclusory allegations that Barclays knew of

insufficient projections or inflated contracts are not enough to support a plausible inference that

defendants either knew about the Firm's problems or conspired to cover them up. *See Iqbal*, 556

U.S. at 681.

### B. The Firm's Financial Condition

It should go without saying that a party cannot be held liable for failing to disclose

information that it does not possess. *See, e.g.*, Restatement (Second) of Torts § 551(2) (1977)

(one party to a business transaction may have a duty to disclose "*matters known to him* that the

other is entitled to know") (emphasis added). Because plaintiff has not adequately alleged

defendants' knowledge of the Firm's financial problems, her allegation that they breached their duty to disclose those problems must necessarily fail.  (*See supra* Part III.A.)  But even if defendants did know this information, Sandza has not adequately alleged that they were obligated to disclose it to her.

In order for the alleged failure to disclose to be actionable, plaintiff must first allege that defendants had a cognizable duty to make that disclosure.  *See Sununu v. Philippine Airlines, Inc.*, 792 F. Supp. 2d 39, 51 (D.D.C. 2011) ("D.C. law provides that nondisclosure of a fact can constitute a fraudulent misrepresentation . . . [if] there is a duty to speak.").  Her complaint contains bare allegations of such a "duty."  (*E.g.*, Compl. ¶ 139 ("Based on this continuous failure to disclose material facts re the Firm's true financial condition, Barclays breached the duty it owed to the non-management partners . . . ."); *id.* ¶ 143(b) (Barclays "failed to discharge its duty to the non-management partners . . . .").  The complaint also asserts that, because plaintiff's loan agreement contained an English choice-of-law provision, Barclays had a duty to disclose arising under English law.  (*Id.* ¶ 158 (alleging a duty arising under Paragraphs 2, 13.1, and 13.4 of the U.K. Banking Code and PRIN 2.1(9)).)  In response to defendants' citation of numerous cases holding that contractual choice-of-law provisions do not apply to tort claims (Defs.' Mot. to Dismiss at 35 n.33), Ms. Sandza fails to cite any relevant U.S. law.  Instead, she doubles down on her assertion that English law applies, arguing that "the duty to speak arose from the fiduciary duty owed by Barclays to Plaintiff under the contractually-chosen English law."  (Pl.'s Opp'n at 21-22.)

Even if the Court were to assume that the English provisions that plaintiff cites are binding sources of law, rather than voluntary codes of conduct (as defendants strongly argue (Defs.' Reply at 19)), there is simply no basis for applying English law to plaintiff's tort claims.

The English choice-of-law provision governing *contract* claims between the parties "simply does not cover *tort* claims arising from the same underlying events unless the parties so intend." *See Minebea Co. v. Papst*, 377 F. Supp. 2d 34, 38 (D.D.C. 2005) (emphasis added). In *Papst*, the court found no such intent where the agreement simply stated "This Agreement shall be governed by and interpreted in accordance with the Laws of New York." *Id.* (emphasis omitted). Plaintiff's loan agreement contains a virtually identical choice-of-law provision ("This facility letter shall be governed by and construed in accordance with the laws of England.") (Loan Agreement ¶ 11.1)). It goes on to state that plaintiff shall submit to the personal jurisdiction of the English courts if Barclays "files an action . . . *to enforce the terms of the loan*." (*Id. ¶* 11.2.) Therefore, the agreement lacks any indicia of intent that English law should apply to tort claims.

Under D.C. law, the general rule is that one party to a transaction has no duty of disclosure to the other unless (1) the party is a fiduciary of the other, or (2) the party knows that the other is acting unaware of a material fact that is unobservable or undiscoverable by an ordinarily prudent person upon reasonable inspection. *See Sununu*, 792 F. Supp. 2d at 51. Neither exception is applicable here. D.C. law establishes that "[t]he relationship between a debtor and a creditor is ordinarily a contractual relationship and not a fiduciary relationship." *See Ponder v. Chase Home Fin., LLC*, 666 F. Supp. 2d 45, 49 (D.D.C. 2009). An exception can be found if "a special relationship of trust or confidence exists in a particular case," *Ellipso, Inc. v. Mann*, 541 F. Supp. 2d 365, 373 (D.D.C. 2008) (internal quotations omitted), where the parties extend their relationship beyond what the contract requires of them. *See Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 6 (D.D.C. 2008). However, plaintiff does not plead any specific facts that suggest something more than a standard, arms-length debtor-creditor relationship. (*See* Compl. ¶ 168 (making only a bare assertion of a "special kind of relationship").) In fact, as

defendants point out, Ms. Sandza does not even allege that Barclays had any direct contact with her, with perhaps the exception of her January 2014 agreement to pay off her Barclays loan balance.  (*See* Defs.' Mot. to Dismiss at 3-4; Compl. ¶ 1.)

Instead, plaintiff alleges that Barclays "knew or should have known how bad things were" at the Firm (Compl. ¶ 150), and that she "had no opportunity to acquire similar knowledge of the inner-workings of the Firm."  (*Id.* ¶ 162.)  As noted, it is true that one party's superior knowledge can give rise to a duty to disclose, when it knows that the other party is acting unaware of a material fact that is "*unobservable* or *undiscoverable* by an ordinarily prudent person upon reasonable inspection."  *See Sununu*, 792 F. Supp. 2d at 51 (internal quotations omitted).  But as discussed, plaintiff's allegations that Barclays knew of the Firm's poor health rest almost entirely upon its alleged knowledge that the Firm defaulted on its capital loan obligations, which the Court has already rejected.  And even if Barclays *did* know of the Firm's poor heath, plaintiff does not explain how Barclays could have known that Sandza did not know (and could not have discovered) the precariousness of her own Firm's finances.  Indeed, as a Firm partner, she had the statutory right to inspect its books.  *See* N.Y. P'ship Law § 41 ("[E]very partner shall at all times have access to and may inspect and copy any of [the partnership books].").  The mere fact that Barclays allegedly "knew that [plaintiff] for the most part would not scrutinize quarterly and/or annual financial statements" (*see* Compl. ¶ 157) offers her no comfort, because her own lack of diligence does not make those facts *undiscoverable*. *See Sununu*, 792 F. Supp. 2d at 51.  By the same token, the fact that the Firm may have refused her access to its books (*see* Compl. ¶ 163) does not cure the problem, because she does not allege that Barclays had any knowledge of that unlawful refusal.

In short, even assuming *arguendo* that Barclays did have superior knowledge of the Firm's finances, plaintiff fails to allege specific facts to support an inference that Barclays knew what she had not learned *and could not have discovered* as a partner of the Firm.  As such, Barclays cannot be charged with a duty to disclose.  To hold otherwise would impose an extraordinary burden on creditors, compelling them to disclose basic information about the debtor's own business, on the off-chance that the debtor may have been too busy to discover it herself (*see id.* ¶¶ 153-57) or may have been unlawfully refused that information by her own partners (*see id.* ¶ 163).  This failure to adequately plead a duty to disclose means that her negligence, fraud, and breach of fiduciary duty claims cannot survive.  By extension, given the Court's rejection of her default allegations, neither can any of her remaining claims.

Furthermore, for the reasons set forth below, there are two additional arguments that doom plaintiff's claims: her civil RICO claims are insufficiently pled, and her state law claims are untimely.

## IV.   FAILURE TO STATE A CLAIM – CIVIL RICO COUNTS

Plaintiff first alleges that the individual defendants participated in a RICO enterprise in violation of 18 U.S.C. § 1962(c).  (Compl. ¶¶ 56-75.)  To state a claim under that subsection, plaintiff must allege "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity."  *Salinas v. United States*, 522 U.S. 52, 62 (1997).  "Racketeering activity" is defined to include acts of mail fraud and wire fraud, 18 U.S.C. § 1961(1)(B), and there must be at least two such predicate acts to constitute a "pattern."  *Salinas*, 522 U.S. at 62.

Where the alleged predicate acts involve mail or wire fraud, as here, plaintiff must satisfy the heightened pleading standard of Rule 9(b), which, at a minimum, requires that defendants be given "fair notice of the plaintiffs' claims and grounds therefore, so that they can frame their

answers and defenses." *See Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 88-89 (D.D.C. 2006) (quoting *Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 963 (D.C. Cir. 1985)).  Typically, that means "stat[ing] the time, place and content of the false misrepresentations, the fact misrepresented[,] and what was retained or given up as a consequence of the fraud." *See Bates*, 466 F. Supp. 2d at 89 (quoting *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)); *see also W. Associates Ltd. P'ship ex rel. Ave. Associates Ltd. P'ship v. Mkt. Square Associates*, 235 F.3d 629, 637 (D.C. Cir. 2001) ("RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.").

Under such a demanding standard, plaintiff's allegations of mail and wire fraud are woefully deficient, for the *only* specific fact she alleges is that there were "approximately 114" such instances.  (*See* Compl. at 1.)  She does not allege a time or a place for any of the alleged frauds, nor does she attribute any of them to the individual defendants, let alone attempt to delineate which individual defendant committed which frauds.  (*See id.* at 1-2 (alleging only that Firm management and *Barclays* committed 114 instances of wire fraud between 2007 and 2012).)  Even if the Court were to read "the individual defendants" in place of "Barclays"—as it would have to do in analyzing a claim against the individual defendants—it would still have no idea which of the "approximately 114 instances" are attributable to Firm management (and thus irrelevant to this analysis).  And even her description of the basic content of Barclays' alleged fraud is frustratingly opaque—Barclays "provid[ed] the means whereby these partners could make capital and other financial contributions to the Firm based on . . . false information." (*See id.*)  Certainly, a fair reading of that allegation is that Barclays committed wire fraud by offering

loans without disclosing material facts, but as discussed above, plaintiff has failed to adequately

allege that Barclays even knew these material facts.  (*See supra* Part III.A.)  Absent specific facts

indicating that Barclays had this knowledge or conspired to conceal it, the mere loan offers

themselves cannot constitute wire fraud, and as such, plaintiff's Section 1962(c) count fails

under both Rule 9(b) and 12(b)(6).

By extension, of course, her related count for *respondeat superior* liability against

Barclays—based on the same RICO allegations rejected above—must also be denied.  (*See*

Compl. ¶¶ 76-79.)  An employer's vicarious liability necessarily depends upon the liability of its

employees, which has not been adequately pled here.  *See Crawford v. Signet Bank*, 179 F.3d

926, 929 (D.C. Cir. 1999) ("In the absence of agent liability, therefore, none can attach to the

principal.").

Next, plaintiff alleges that Barclays violated 18 U.S.C. § 1962(a), which prohibits the use

or investment of racketeering income in an enterprise.  (*See* Compl. ¶¶ 80-93.)  In order to state a

claim under this subsection, plaintiff must adequately allege that she was injured by Barclays'

use or investment of racketeering income, rather than by the racketeering activity itself.

*Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229 (D.C. Cir. 1991) ("It

is not sufficient to allege injury flowing from the predicate acts of racketeering.").  Her

explanations of both the "reinvestment" and causation are difficult to parse.  She identifies the

"racketeering income" as "the monies induced by fraud from the Plaintiff and other non-

management partner victims," and she alleges that "Barclays, through the Control Group . . .

**reinvested** the capital loan funds 'in the Firm.'"  (*See* Pl.'s Opp'n at 14 (emphasis in original).)

It is unclear how Barclays can be charged with "reinvesting" loan funds in the Firm, when

plaintiff alleges that *the partners themselves contributed those funds to the Firm*.  (*See, e.g.*,

Compl. ¶ 25 (partners could choose to make their capital contributions up front in cash, by withholding from draws, or by participating in Barclays loan program); *id.* ¶ 172 (Barclays loan program would "fund [partners'] required capital contributions to the Firm").)  Barclays merely provided her the access to the funds, but plaintiff does not explain what legal basis Barclays would have had for controlling the use of those funds or directing them elsewhere, such that it could be held liable merely for "*allowing* the investment . . . into the Firm."  (*See id.* ¶ 93 (emphasis added).)  In fact, the only racketeering income Barclays itself is alleged to have received—"interest on loans and credit facilities"—is *not* alleged to have been reinvested back into the Firm.  (*See* Pl.'s Opp'n at 14.)

Moreover, this alleged "reinvestment" and the deferred compensation injury lack a causal connection, because her own allegations show that she would have suffered the injury either way.  She alleges that the reinvestment caused her a separate injury (*id.*), because she would not have agreed to accept deferred compensation had Barclays "not delayed the Firm's collapse by allowing the investment of the capital funds into the Firm" (Compl. ¶ 93).  In other words, the Firm would have collapsed but for that reinvestment, and because the Firm had not yet collapsed, she was induced to accept deferred compensation.  According to her own allegations, then, *the Firm would have already gone bankrupt but for that delay*, and she would never have seen the deferred compensation anyway.  Instead, as she alleges elsewhere in her complaint, the deferred compensation injury is simply a second, consequential injury flowing from her unawareness of the Firm's problems.  (*See* Compl. ¶ 73 ("Had Barclays disclosed the truth about the Firm's operations . . . the Plaintiff would not have agreed to deferred compensation arrangements to be paid over future periods.").)  Furthermore, she claims deferred compensation damages under her

Section 1962(c) count as well (*see id.*), putting to rest any notion that they constitute a separate and distinct "reinvestment" injury.

Finally, plaintiff alleges that Barclays violated 18 U.S.C. § 1962(d) by conspiring with Firm management to commit a RICO violation.  (*See* Compl. ¶¶ 94-103.)  The Court has already rejected her allegations of an underlying Section 1962(c) violation by the individual defendants, which would ordinarily mean that her related conspiracy claim must also be rejected.  *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995). However, plaintiff alleges separately that the Firm also committed wire fraud with defendants' knowledge.  (*See* Compl. at 1.)  This allegation could serve as a separate basis for finding a RICO conspiracy, but for the fact that, once the non-existent defaults are disregarded, plaintiff fails to allege enough specific facts to permit a plausible inference that (1) Barclays knew about the Firm's problems, or (2) conspired with Firm management to cover them up.  (*See supra* Part III.A.)  Plaintiff's bare assertions that Barclays "knew or should have known" how bad things were at the Firm (Compl. ¶ 150), or that it "had to know" that the non-management partners were taking out loans based on false information (*id.* at 4), cannot be a substitute for specific allegations of fact from which to infer that Barclays did, in fact, have such knowledge. Therefore, plaintiff fails to state a conspiracy claim under Section 1962(d).

## V.    STATUTE OF LIMITATIONS – STATE LAW COUNTS

The statute of limitations for plaintiff's state law claims of fraud, negligence, breach of fiduciary duty, aiding and abetting, conspiracy, and declaratory relief is three years.  *See* D.C. Code § 301(8).  As such, those claims must be dismissed as time-barred if they accrued prior to May 14, 2012.  (*See* Compl. (filed May 14, 2015).)  The Firm filed for bankruptcy just two weeks after that date (*id.* at 3), and it was only then that plaintiff alleges that she and the other

non-management partners first learned of the Firm's "defaults" and financial woes (*see id.* ¶ 118).  In other words, she suggests that she did not have actual knowledge of her potential claims until at least May 28, 2012, and therefore her state law claims are timely.  As it must at this stage, the Court credits plaintiff's assertion that she did not have advance notice of the Firm's troubles, no matter how implausible that may seem in light of: (1) the Firm's alleged refusal to return her capital account balance in 2010 (*id.* ¶ 46); (2) the Firm's alleged unlawful refusal to allow her to inspect its books (*id.* ¶ 163); (3) the slew of news articles publicizing the Firm's troubles prior to the bankruptcy filing;[6] and (4) her natural interest in her prior Firm, which owed

---

[6] *See, e.g.*, Duff McDonald, *Dewey & LeBoeuf: Partner exodus is no big deal*, Fortune, Mar. 22, 2012, *available at* http://fortune.com/2012/03/22/dewey-leboeuf-partner-exodus-is-no-big-deal/ (noting that, despite Firm's claim that its finances were sound, "30 partners have fled the law firm after an earnings miss in 2011"); Jennifer Smith & Ashby Jones, *More Partners Leave Dewey & LeBoeuf LLP*, The Wall Street Journal, Mar. 23, 2012, *available at* http://blogs.wsj.com/law/2012/03/27/shake-it-up-dewey-leboeuf-overhauls-its-leadership/ (describing a "flow of [partner] defections since the start of the year" and "plans to cut lawyers and administrative staff, following lower than expected profits in 2011"); Linda Sandler & Sophia Pearson, *Dewey & LeBoeuf Approaches Deadline on $75 Million Bank Debt*, Bloomberg, Apr. 27, 2012, *available at* http://www.bloomberg.com/news/articles/2012-04-27/dewey-leboeuf-approaches-deadline-on-75-million-bank-debt (Firm facing "deadline to show bank lenders it has a survival plan, possibly including absorption by another firm"); Peter Lattman, *Dewey & LeBoeuf Said to Encourage Partners to Leave*, New York Times, Apr. 30, 2012, *available at* http://dealbook.nytimes.com/2012/04/30/dewey-leboeuf-said-to-encourage-partners-to-leave/ (beginning "Dewey & LeBoeuf, the New York law firm *crippled by financial mismanagement, an exodus of partners and a criminal investigation of its former chairman,* encouraged its partners on Monday evening to look for another job . . . .") (emphasis added); Andrew Longstreth & Nate Raymond, *The Dewey chronicles: The rise and fall of a legal titan*, Reuters, May 11, 2012, *available at* http://www.reuters.com/article/us-dewey-recap-idUSBRE84B00L20120512 (describing a January 2012 meeting of Firm partners at which they were informed by Firm chairman Steven Davis that "[t]he firm was living on the edge [of bankruptcy].").  This list is by no means comprehensive: the Wall Street Journal's Law Blog alone published *forty* articles detailing the Firm's pending collapse between March 2012 and the bankruptcy filing.  *See* http://blogs.wsj.com/law/tag/dewey-leboeuf/.  The New York Times published at least twenty-five such articles in that same period.  *See* http://query.nytimes.com/search/sitesearch/?action=click&contentCollection&region=TopBar&

her nearly a million dollars (*see id.* ¶ 103).  Even so, her state law claims are untimely because she had inquiry notice of them prior to May 14, 2012.  *See Drake v. McNair*, 993 A.2d 607, 617 (D.C. 2010) (actual or inquiry notice sufficient to trigger statute of limitations).

Under D.C. law, a claim usually accrues at the time the alleged injury occurs.  *Diamond v. Davis*, 680 A.2d 364, 389 (D.C. 1996).  Here, plaintiff alleges that she was injured when she took out capital loans and agreed to accept deferred compensation, without full knowledge of the Firm's problems.  (*See* Compl. ¶ 124.)  That would ordinarily mean that her claims accrued by March or April 2010 at the latest.  (*See id.* ¶ 1.)  However, "where the relationship between the fact of injury and the alleged tortious conduct is obscure when the injury occurs," D.C. courts apply the more forgiving discovery rule.  *See Bussineau v. President & Directors of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986).  Sandza alleges that defendants' failure to disclose the Firm's problems kept her from recognizing her injury until the bankruptcy filing (*see* Compl. ¶ 118), and as such, the Court will apply the discovery rule to her claims.

Under the discovery rule, a claim accrues "when a plaintiff has either actual or inquiry notice of (1) the existence of the alleged injury, (2) its cause in fact, and (3) some evidence of wrongdoing."  *Drake*, 993 A.2d at 617.  A plaintiff need not know everything about her potential claims before the statute will run, but instead, she must only know (or have reason to know) enough to give rise to a duty to inquire further.  *See Diamond*, 680 A.2d at 389-90.  At that time, if a potential plaintiff, in the exercise of reasonable diligence, could learn enough to justify filing suit before the expiration of the limitations period, then the statute begins to run.  *Id.* at 390.  Whether a plaintiff can be charged with inquiry notice is governed by an objective standard, *i.e.*,

---

WT.nav=searchWidget&module=SearchSubmit&pgtype=Homepage#/dewey+%26+leboeuf/from20120301to20120528/.

what a reasonable person would have done in plaintiff's circumstances.  *See Hendel v. World*

*Plan Exec. Council*, 705 A.2d 656, 664 (D.C. 1997).  As such, "a potential plaintiff may be

legally accountable for investigating a possible claim *before* learning 'some evidence of

wrongdoing'"—if enough information is available to her that a reasonable person would

investigate and thus learn of the wrongdoing, then she has been put on inquiry notice.  *See*

*Diamond*, 680 A.2d at 390; *see also Ray v. Queen*, 747 A.2d 1137, 1141-42 (D.C. 2000) ("The

critical question in assessing the existence *vel non* of inquiry notice is whether the plaintiff

exercised reasonable diligence under the circumstances in acting or failing to act on whatever

information *was available to* [*her*].") (emphasis added).

There is no question that information about the Firm's pending collapse was available to

Ms. Sandza in the months leading up to the bankruptcy filing.  (*See supra* n.6 (and articles cited

therein).)  There is also no question that this was the very information she claims should have

been disclosed when she took out the loans and agreed to accept deferred compensation, thus

causing her injury.  (*See, e.g.*, Compl. ¶¶ 73-74.)  Moreover, the available news articles offered

her far more than the simple fact that the Firm was in trouble in 2012; they also clearly alerted

her to the possibility of fraud by Firm management, including the overstatement of previous

years' earnings.[7]  Even accepting her contention that she had no actual knowledge of the Firm's

---

[7] *See, e.g.*, Julie Triedman, *Dewey & LeBoeuf's 2010, 2011 Profits, Revenues Revised*, The
AmLaw Daily, Apr. 3, 2012, *available at*
http://amlawdaily.typepad.com/amlawdaily/2012/04/dewey-2010-2011-financials-revised.html
(noting that the Firm earned "far less" in 2010 and 2011 than it had previously reported to The
American Lawyer, causing the publication to issue a correction); Peter Lattman, *Prosecutors
Scrutinize Ex-Head of Dewey*, N.Y. Times, Apr. 28, 2012, *available at*
http://dealbook.nytimes.com/2012/04/27/new-york-prosecutors-examining-former-dewey-
chairman/?_r=0; Peter Lattman, *Teetering, Dewey Ousts Ex-Head From Post*, N.Y. Times, Apr.
29, 2012, *available at* http://dealbook.nytimes.com/2012/04/29/dewey-leboeuf-ousts-ex-head-
steven-h-davis/ (state prosecutors' investigation triggered by evidence of possible financial
improprieties provided by several Firm partners, including management's misleading of lenders

pending bankruptcy or criminal investigation, all of this information was readily available to her so that she must be charged with constructive knowledge of it.  *See, e.g.*, *Drake*, 993 A.2d at 617 (charging plaintiff with constructive knowledge of information that was contained in publicly available land records); *Alkasabi v. Washington Mut. Bank, F.A.*, 31 F. Supp. 3d 101, 109 (D.D.C. 2014) (because bank's bankruptcy was "widely publicized," and notice of its FDIC receivership was published in newspapers of general circulation, plaintiffs had constructive knowledge of those facts).

By extension, a reasonable person in Sandza's position would have been spurred by this information to investigate further, and in doing so, she would have learned more than enough to file her claim within the three-year limitations period.  *See Diamond*, 680 A.2d at 389-90. Plaintiff all but acknowledges as much.  (*See* Pl.'s Opp'n at 34 (disclosure of the Firm's problems "would have given her fair warning that . . . certain material facts had not been disclosed to her, i.e., undisclosed debt obligations, inflated earnings projections, and phony invoices").  She instead takes issue with the news articles' reliability, arguing that disclosure by Barclays would have been more reliable and thus put her on sufficient notice.  (*See id.*)  But even if one can fairly question the reliability of the New York Times, the Wall Street Journal, Fortune, Reuters, Bloomberg, and The American Lawyer, a reasonable person would still have sought more information from the Firm's current or former partners.  Indeed, plaintiff alleges that she would have done precisely this, if informed by *Barclays* of the financial problems.  (See Compl. ¶ 73 ("Had Barclays disclosed the truth . . . [she] would have initially discussed the Firm's

---

about Firm's financial condition); Ashby Jones, *Dewey's Former Chairman Lawyers Up*, Apr. 30, 2012, *available at* http://blogs.wsj.com/law/2012/04/30/deweys-former-chairman-lawyers-up/ (describing Manhattan DA's investigation into "goings-on at Dewey, with particular focus on [former Firm chairman Steven] Davis").

financial plan with the remaining partners at D&L so that she . . . could take steps to protect herself."). In short, a reasonably diligent investigation would have confirmed: (1) her injury (the capital contributions and deferred compensation that now would almost certainly never be repaid); (2) its cause in fact (the non-disclosure of the Firm's financial troubles at the time she took out her loans and agreed to defer receipt of her capital contributions); and (3) some evidence of wrongdoing (the allegations of fraud by Firm management). *See Drake*, 993 A.2d at 617. Thus, plaintiff had inquiry notice of her claims more than three years prior to filing, and her state law claims are therefore untimely.[8]

Plaintiff raises numerous objections to being charged with inquiry notice. First, she argues that the Court cannot take judicial notice of these news articles, because they are "classic hearsay" and thus inherently unreliable. (*See* Pl.'s Opp'n at 32.) However, the Court is not accepting these articles for the truth of their assertions, but rather for the fact that they contained certain information, which (true or not) should have put plaintiff on notice of the need to investigate her potential claims. *See* Fed. R. Evid. 801(c)(2). Taking judicial notice of the *existence* of these articles is entirely proper. *See Washington Post v. Robinson*, 935 F.2d 282,

---

[8] Because every one of the articles cited *supra* nn.6-7 was published more than three years before plaintiff filed her complaint, it is unnecessary to locate a precise date on which she had inquiry notice. Suffice it to say that she certainly had such notice by the time of the May 11, 2012 Reuters article by Longstreth & Raymond—*The Dewey chronicles: The rise and fall of a legal titan*. That article stated that management "often withheld crucial information from their partners;" that the Firm "never made its budget targets after the merger;" that the Firm's $125 million bond offering March 2010—the month before Sandza's departure—"suggested that [the Firm] needed money it could not immediately repay;" that in October 2011, the Firm "made a startling disclosure about [compensation] guarantees," *i.e.*, the "inflated contracts" alleged by plaintiff; that a criminal investigation was underway; and that "[g]iven Dewey's immense liabilities, no one has offered a likely scenario under which the partnership could survive." *Id.* Most, if not all, of this information was already available elsewhere (*see supra* nn.6-7), but the Reuters article simply laid it out starkly and comprehensively. That information was more than sufficient to give rise to a duty of inquiry, and thus the limitations period had begun to run by then, at the very latest. *See Diamond*, 680 A.2d at 389-90.

291 (D.C. Cir. 1991) (a "court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized" certain facts).

Second, she argues that, on a motion to dismiss, the Court cannot take judicial notice that there has been "extensive press coverage," a finding of fact that she argues would be necessary to charge her with inquiry notice.  (*See* Pl.'s Opp'n at 31-32.)  Nowhere does she cite authority suggesting that inquiry notice depends upon the number of articles published, and in fact, courts have found inquiry notice where the information available to plaintiff was far more meager or inaccessible.  *See, e.g.*, *Drake*, 993 A.2d at 617 (finding on a motion to dismiss that publicly available land records gave plaintiff access to all the necessary facts to put her on inquiry notice); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) (finding on a motion to dismiss that two articles by each of Nashville's two leading newspapers, and a report by Nashville's CBS affiliate, were sufficient to trigger inquiry notice); *Shah v. Stanley*, 2004 WL 2346716, at *8 (S.D.N.Y. Oct. 19, 2004) (finding on a motion to dismiss that two articles in Fortune were sufficient to trigger inquiry notice).  Therefore, the Court need not find that the press coverage was "extensive;" it simply finds that the press coverage was sufficient, as a matter of law, to put a reasonable person on notice of the need to investigate.

Finally, she argues that the press coverage could not have adequately put her on notice because none of it mentioned Barclays.  (*See* Pl.'s Opp'n at 35.)  But as discussed, a plaintiff need not be aware of every fact pertaining to her cause of action before the limitations period begins to run.  *See Diamond*, 680 A.2d at 389-90.  And, as particularly relevant here, "the relationship of the defendants, together with other facts, may establish as a matter of law that a reasonable plaintiff with knowledge of the misconduct of one would have conducted an investigation as to the other."  *Id.* at 380.

In *Diamond*, plaintiff alleged an elaborate conspiracy between the lawyer defending him in a tax fraud case, his lawyer's firm, the federal judge presiding over his tax fraud case, and the Reynolds family, which owned a company against whom plaintiff had separately brought a civil RICO case. *See id.* at 385.  In short, he alleged that his lawyer, who also represented the J. Sargent Reynolds estate and whose firm represented Reynolds Metals, advised him to waive a jury trial in order to give control over the verdict to the federal judge, who had a close personal relationship with the Reynolds family and served as executor for the J. Sargent Reynolds estate. *See id.*  When the judge then convicted him of tax fraud, plaintiff alleged that the conspiracy succeeded, in that he was subsequently discredited in his failed RICO suit against Reynolds Metals. *See id.*  Plaintiff argued that his claims against the lawyers were not time-barred because the lawyers fraudulently concealed their conflicted representation of Reynolds Metals, and thus, he lacked knowledge of a crucial link in the alleged conspiracy. *See id.* at 385-86.  The D.C. Court of Appeals disagreed, finding that he had sufficient knowledge to trigger inquiry notice: he knew of his injury (the tax fraud conviction); its cause (the judge's verdict facilitated by his lawyer's advice to waive jury trial); the relationship between the judge and the Reynolds family; the relationship between his lawyer and the judge, who worked together in executing the J. Sargent Reynolds estate; and the firm's representation of another member of the Reynolds family. *See id.* at 385-89.  Armed with that knowledge, particularly the working relationship between the firm and the Reynolds family, a reasonable person would have investigated further and found public documents revealing the firm's representation of Reynolds Metals. *See id.* at 388.

The D.C. Circuit has also followed this approach, affirming dismissal of a complaint where press reports put plaintiff on inquiry notice of an alleged conspiracy to deny him ballot

access, even though the reports failed to name all of the alleged co-conspirators. *See Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 701 (D.C. Cir. 2009) (applying D.C. law) (Washington Post article discussed a legal campaign against plaintiff waged "by the Democratic Party *and like-minded groups*") (emphasis added). The Court found that plaintiff was already aware of the allegedly improper conduct, and thus his later discovery of additional co-conspirators did "not alter the fundamental nature of the wrong at issue." *Id.* The Court next considered whether, even if the plaintiff's claims against known conspirators were time-barred, he could still pursue claims against the unknown conspirators, but again it found he could not. *See id.* at 702. It held that the relationship between the Democratic Party and the unknown conspirators (the Democratic National Committee and the Kerry-Edwards campaign) was sufficiently close that a reasonable person would have investigated their potential involvement. *See id.*

Taken together, *Diamond* and *Nader* foreclose plaintiff's assertion that press coverage could only put her on inquiry notice if it mentioned Barclays. The press coverage put her on notice of both the Firm's problems and potential fraud by Firm management in covering those problems up. (*See supra* nn.6-7.) She was thus alerted to her injury, its cause in fact, and the likelihood of wrongdoing by Barclays' alleged co-conspirators at the Firm. As in *Nader*, plaintiff's discovery of Barclays' alleged involvement did not "alter the fundamental nature of the wrong at issue" (*see* 567 F.3d at 701); she made certain financial decisions without material facts, and whether the Firm alone withheld (or misrepresented) those facts, or whether Barclays also participated, is largely irrelevant to her injury. And, as in both *Diamond* and *Nader*, plaintiff was aware of the close working relationship between Barclays and the Firm, such that a reasonable person would have investigated Barclays' potential involvement. First, she knew that Barclays had extended the Firm two unsecured loans worth $35 million. (*See* Compl. ¶¶ 22, 34.)

By extension, she knew that, "as a prime institutional lender to D&L, Barclays received periodic financial statements and other customary information from D&L." (*See id.* ¶ 28.) Next, she knew that Barclays and the Firm co-sponsored the partner loan program, the proceeds of which she believes was used to repay Barclays on the Firm's loans. (*Id.* ¶¶ 25(c), 38.) She also knew that Barclays had been fully repaid as of December 2010 (*see id.* ¶ 38), in contrast to the remaining creditors that pushed the Firm into bankruptcy.[9]

In terms of defaults, she knew what her own loan agreement did (or did not) require of the Firm, and she could have inquired of current and former Firm partners about whether the Firm was living up to those obligations. Most crucially, she concedes that learning of the Firm's problems "would have given her fair warning that . . . certain material facts had not been disclosed to her, i.e., undisclosed debt obligations." (*See* Pl.'s Opp'n at 34.) That concession is critical. If the articles would have tipped her off to the undisclosed defaults, then they would almost certainly have tipped her off to Barclays' involvement—it is hard to imagine how such defaults could have gone unremedied or undisclosed without Barclays' approval of, and/or participation in, the alleged scheme.

The Court recognizes that "[w]hen accrual actually occurred in a particular case is a question of fact," *Diamond*, 680 A.2d at 370, so it cannot make that determination at this stage unless no reasonable fact-finder could find otherwise. But where a former partner at an international law firm is owed nearly a million dollars by that firm, the Court finds that, as a

---

[9] Whether or not she had actual knowledge of all of these facts at the time of the press coverage, her complaint makes clear that they were then readily available to her in the Firm's audited financial statements (*see* Compl. ¶¶ 22, 34, 38), and thus a reasonably diligent investigation would have turned them up. *See Ray*, 747 A.2d at 1141-42 (relevant inquiry is what a reasonable plaintiff would do with "whatever information was *available* to [her]") (emphasis added).

matter of law, no reasonable person would have failed to take note of even one of the scores of national news articles putting her on notice of her potential claims.

## CONCLUSION

The defendants' motions to dismiss will be **GRANTED**.  A separate order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: December 22, 2015